# EXHIBIT B

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
Tampa Division

JERRY WOJCIK, an individual,
on behalf of himself and others similarly situated,

      Plaintiff,

v.                             Case No. 8:12-cv-2414-T-23TBM

BUFFALO BILLS, INC.,
a New York corporation,

      Defendant.

_____ /

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1.    My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.    I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by the Law Office of Scott D. Owens, Esq. to provide my expert opinions relating to technology described within the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA") and their claims that defendant, BUFFALO BILLS, INC. (nicknamed "the Bills"), maintains an Automatic Telephone dialing System ("ATDS") as defined in the TCPA. In particular, I have been asked to determine whether the Bills employed equipment which has the capacity to store or produce telephone

numbers to be called, using a random or sequential number generator; whether the Bills, in fact, used such equipment; whether the Bills employed equipment which has the capacity to dial telephone numbers without human intervention; and whether the Bills, in fact, dialed such numbers without human intervention.

3.      My opinions in this declaration are based on my education, experience, training, my own participation in the text message alerting campaign at issue in this case and my review of the following documents in this case: Class Action Complaint For Statutory Damages And Injunctive Relief Under 47 U.S.C. § 227 et seq,. The Telephone Consumer Protection Act; Memorandum Of Law In Support Of Buffalo Bills. Inc.'s Motion To Dismiss The Complaint, Or In The Alternative, Motion For Summary Judgment; Declaration of Charley Cassell; Buffalo Bills website text alert privacy                 policy               http://www.buffalobills.com/about-us/privacypolicy.html#text-alerts; Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA") and regulations promulgated thereunder; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated January 4th, 2008; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated February 15th, 2012; and the Appeal from the United States District Court for the Northern District of California,

2

No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed June 19th, 2009.

4.    I have over 25 years of experience in telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the fields of both wireline and wireless telecommunications networking technology. A copy of my curriculum vitae is attached to this declaration. I have been a testifying or consulting expert in 39 cases regarding telecommunications technology including 31 cases regarding Short Message Service (SMS) technology and 16 cases regarding the TCPA and associated regulations.

5.    I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless

3

networks, which is a fully accredited national standard of the American National Standards Institute (ANSI). I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for wireless engineers at AT&T Wireless and Motorola for several years. The latter book has also been relied upon and cited numerous times as a reference for various patents in the telecommunications industry. I have been granted 10 patents myself on telecommunications networking technology and currently have eight additional published patents pending. I have also authored several articles on telecommunications technology and have been quoted numerous times in industry trade publications. I have consulted and been employed for many wireline and wireless telecommunications companies including McCaw Cellular, AirTouch, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc. Still more detail as well as details of publications that I have authored or co-authored within at least the past

4

10 years are provided in my curriculum vitae attached as Exhibit C along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $400 per hour for my study, analysis and testimony in this case.

6.    Based on my experience and expertise, I can confidently say that the Bills utilized an ATDS defined as equipment which has the capacity to store or produce cellular telephone numbers to be called, using a random or sequential number generator; and which has the capacity to dial such numbers, without human intervention as defined by the TCPA. In addition, it is evident that Vibes Media, LLC ("Vibes") maintains and operates an ATDS on behalf of the Bills which stores telephone numbers to be called, dials those telephone numbers in sequence from a list of numbers and in fact does call those numbers from the list.

7.    The use of Short Message Service (SMS), more commonly known as "text messaging" in the U.S., is ubiquitous. There are currently more than 330 million cellular subscriber connections in the U.S., according to the Cellular Telecommunications and Internet Association, and more than 193 billion text messages are currently sent each month.

8.    The use of Short Message Service ("SMS"), more commonly known as "text messaging" in the U.S., has become ever-present. SMS is defined as a "peer-to-peer" messaging technology, meaning that it is a

5

communications system and method designed to enable an individual cellular subscriber to send or originate a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, i.e., the message recipient. SMS messages are sent individually from one subscriber to another using cellular telephone numbers as the destination address of the message. The message sender's cellular telephone number is preserved as part of the message at the destination cellular telephone where the message is received so that the message recipient knows the cellular phone number address of the message sender.

9.    Over the past several years many companies have emerged that provide what is known as value-added text messaging services using SMS technology. These companies are technically referred to as Value Added Service Providers (VASPs) and many of them are external entities to the cellular network operators. These VASPs provide a variety of text messaging services (i.e., SMS) that are not strictly peer-to-peer in the sense of subscriber-to-subscriber; rather, they are companies that use automated computer equipment to send and receive text messages using SMS to and from individual cellular telephone subscribers. Based on my review of the materials in this case, Vibes is a VASP.

6

10.   These VASPs are typically in the business of creating and operating text message-based applications on behalf of branded or marketing companies that desire to develop and maintain some personalized communication with cellular telephone subscribers. These VASPs have the ability to send large quantities of text messages en masse to subscribers as well as receive individual text messages from those subscribers. Messages sent from a VASP to a cellular subscriber are termed "mobile-terminated" ("MT") and messages sent from a cellular subscriber to a VASP are termed "mobile-originated" ("MO").

11.   VASPs connect to the cellular carrier networks using internet-based connections and communications protocols. The primary protocol used is known as the Short Message Peer-to-Peer ("SMPP") protocol. SMPP is an internet-based communications protocol specifically designed for communications between a VASP and a cellular network's Short Message Service Center ("SMSC"). SMSCs are network entities that are maintained and controlled within the cellular carriers' networks and are the store and forward repositories for text messages to be both delivered to and sent from mobile subscribers.

12.   The automated computer equipment that these VASPs employ is used for a variety of text messaging applications, marketing campaigns and dialogs used to communicate with cellular subscribers. Common applications are voting (among the most popular examples is text

7

message voting used to vote for contestants on the American Idol television program) and the ability to register to receive text message information services such as news alerts, sports scores, stock quotes, etc. where short messages are sent to cellular subscribers on a regular basis.

13. "Opting-in" is a term that describes a method by which a cellular subscriber explicitly and expressly provides individual consent to inform the VASP that they are willing to receive messages from the VASP for a specific text message application or campaign. Generally, consent is not broadly given for multiple text message applications nor is it given in some "open-ended" fashion (i.e., without limitation) such that a subscriber can "opt-in" to receive any and all application-based text message traffic.

14. There are many methods by which a cellular telephone subscriber can "opt-in." One common method is a text message response by the cellular subscriber to the VASP based upon some sort of "call to action." For a given application or text message campaign, this "call to action" can be a commercial advertisement from a website, television, radio, newspaper, magazine, billboard, etc. For instance, the actual "call to action" is usually a read or heard message indicating that the cellular subscriber can send a text message to a particular numeric address along with a keyword or words that make up the body of the message. The cellular

8

subscriber uses this MO text message that is sent to the VASP to "opt-in" to the desired application service (such as to receive regular sports updates or to vote for an American Idol contestant).

15. VASPs' connections to the cellular network operators are Internet connections and use a special number as the address by which cellular text messages are sent and received in order to communicate with cellular subscribers. All messages sent to a particular subscriber are delivered to that subscriber's "home" SMSC within the subscriber's home cellular network. Since VASPs are not mobile subscribers, they are not identified by a mobile telephone number; rather, VASPs use a special number as an originating address for short text messages sent to mobile subscribers. This number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, Neustar, Inc., that manages and assigns these number resources in the U.S. on behalf of the cellular network operators. Individual short code numbers are either leased by the VASPs on behalf of the companies for which a mobile messaging application is being run or they can be leased by the branded companies themselves and provided to the VASPs. In either case, the VASPs subsequently request that these numbers be provisioned (i.e., programmatically stored) by the cellular network operators so that MO messages can be properly sent from cellular subscribers to the correct VASP platform applications. In

9

this case, the cellular network operators approve the service application that uses an individual short code before it is provisioned in their networks. The process requires that the VASP draft and submit a detailed written description of the service application that uses the short code. The detailed description typically contains a representation of the text content of messages that are to be sent to and received from cellular subscribers, the precise "opt-in" method to be used by cellular telephone subscribers, the anticipated number of cellular telephone subscribers expected to be involved in the application communication, the anticipated number of text messages expected to be sent and received in the application communication, when the application will start and end, how the subscriber can "opt-out" of the program along with other details.

16.   When a cellular subscriber "opts-in" to a mobile messaging application using a short code address along with a keyword or words that make up the body of the message, the VASP records and saves the cellular subscribers' phone numbers in a database or electronic list. The phone numbers are derived from incoming MO text messages received by the VASP. The cellular subscriber phone numbers typically need to be saved by the VASP for a given application or campaign for a variety of reasons. The application may be based primarily on MT messages once a subscriber has "opted-in," such as sending sports scores, news, notifications, reports or alerts on a regular basis, or the application may

10

be based on an ongoing dialog between the VASP and the cellular subscriber such as trivia questions and responses.

17.   Vibes is a company that provides mobile text messaging services to cellular telephone subscribers on behalf of branded or marketing companies that desire to develop and maintain some personalized communication with those subscribers.

18.   Based upon my experience and expertise, and the materials reviewed, Vibes is a Value Added Service Provider (VASP) that operates an automated computer equipment system providing SMS-based applications that enable text message communications between those applications that are run on the system and cellular subscribers. The applications that Vibes develops are used to form a commercial relationship with cellular subscribers and to use the cellular networks and text messaging technology to form that relationship.

19.   Vibes created, operated and executed a text messaging application on behalf of the Bills whereby initial communication between Vibes, as a VASP, and cellular subscribers is invoked by individuals who "opt-in" by sending a mobile-originated (MO) text message to the short code "64621" with the keyword "BILLS" that makes up the body of the message. Vibes responds automatically, and without human intervention, to the cellular subscriber's request to "opt-in" by storing the received cellular telephone

11

Case 8:12-cv-02414-SDM-TBM   Document 12-2   Filed 12/07/12   Page 13 of 18 PageID 104

number (that is, received as the originating subscriber's text message address) in a database and sending a mobile-terminated (MT) text message to the cellular telephone number as an "opt-in" confirmation. In fact, I agree with Mr. Charley Cassell, Chief Financial Officer of Vibes Media, LLC, in his declaration that "This cellular phone number is retained on Vibes' servers for the purpose of enabling BBI [the Bills] to send text messages to that number." In order for Vibes to send additional MT text messages to cellular subscribers, the subscribers' cellular telephone numbers are stored on their equipment, according to Mr. Cassell in his declaration.

20. It is my understanding that The United States Court for the Ninth Circuit has held that "a text message is a 'call' within the meaning of the TCPA" (Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion, June 19th, 2009, p. 7339). Furthermore, The United States Court for the Ninth Circuit has reiterated that "[t]he use of stored numbers, randomly generated numbers or sequentially generated numbers used to automatically originate calls is a technical difference without a perceived distinction... (Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion, June 19th, 2009, p. 7338). Moreover, the FCC has held that prohibitions under the TCPA apply to lists of telephone numbers as well as random or sequentially generated numbers (Rules and Regulations Implementing the Telephone

12

Consumer Protection Act of 1991, CG Docket No. 02-278, January 4th, 2008). Additionally, the FCC has held that prohibitions under the TCPA apply equally to both voice and SMS calls to cellular telephone numbers (Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, February 15th, 2012).

21. On or about September 12th, 2012, the Plaintiff subscribed to the Buffalo Bills mobile text message alerts program application. The Plaintiff "opted-in" to the program by sending a text message to the short code "64621" with the keyword "BILLS" in the body of the message. According to Mr. Cassell, the Plaintiff's cellular telephone number, received as the originating address of the text message, was stored on Vibes' automated computer equipment, as is the case for each subscriber of the Bills text message alerts program application.

22. I myself engaged and "opted-in" to the Buffalo Bills mobile text message alerts program application on Saturday, December 1st, 2012. In fact, I "opted-in" with two separate and distinct mobile phones. On both devices, I "opted-in" by sending a text message to the short code "64621" with the keyword "BILLS" in the body of the message. I attempted to submit these text messages on both mobile phones at the same time (by pressing the respective "send" buttons simultaneously). In a matter of one or two seconds I received an MT confirmation text message on both

13

devices. The identical confirmation message was received on both mobile phones within about one second of each other.

23. Over the course of the next five days, I continued to receive text message alerts from the Buffalo Bills mobile text message alerts program application on both mobile phones within a second or two of each other. Each received text message was identical on both devices.

24. It is evident that, in fact, the Buffalo Bills mobile text message alerts program application stored the cellular telephone numbers on computer equipment for the subsequent sending of MT text message alerts. Since each MT text message alert sent to cellular subscribers contains identical content and these messages are sent to cellular telephone subscribers en masse and in rapid succession, they must have been sent by automated computer equipment and without human intervention. There is no doubt that the content of each alert sent to all cellular telephone subscribers that have "opted-in" to the application program is created manually at some point; however, the placement of this content in the body of the MT text messages to be sent en masse and the transmission of those text messages occurs in an automated fashion and without human intervention.

25. Plaintiff alleges that, although he "opted-in" to the Buffalo Bills mobile text message alerts program application, additional and unwanted text

14

messages were sent to him on behalf of the Bills for the alerts program application. These additional and unwanted text messages were not expressly represented to the Plaintiff in the terms and conditions of the Bills Text Alerts program nor were they expressly represented to the Plaintiff after "opting-in" to the program. Generally, and in my experience, "opt-in" consent is not broadly given for text message applications in some "open-ended" fashion (i.e. without limitation) such that a cellular telephone subscriber "opts-in" to receive additional and unwanted text messages above and beyond those represented by the application program at the time consent was provided.

26.   Counsel for the Defendant recognizes that at least one additional and unwanted text message was allegedly received by the Plaintiff in the Memorandum Of Law In Support Of Buffalo Bills. Inc.'s Motion To Dismiss The Complaint, Or In The Alternative, Motion For Summary Judgment: "The receipt of merely one allegedly unauthorized text, when prior consent had been given..." If, in fact, Plaintiff's allegation is true, Plaintiff did receive additional and unwanted text messages from the Bills.

27.     In my opinion, Vibes' automated system used to process the initial MO "opt-in" text messages as well as the procedure to provide subsequent text messaging alert services on behalf of the Bills to cellular telephone subscribers, not only has the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, it did, in fact, perform these functions as shown by the text messages that were sent to the Plaintiff and to other cellular telephone subscribers. Furthermore, the FCC has promulgated additional TCPA regulations stating that numbers dialed from a list or database also fulfill the definition of an ATDS as do text message communications representing a call. In the case of the Bills, Vibes stored cellular telephone numbers in a database to be called, subsequently dialed those numbers automatically and without human intervention resulting in additional and unwanted text messages to those numbers.

28.     In summary, it is my opinion that Vibes, on behalf of the Bills, utilized an automated text messaging application in its capacity as a Value Added Service Provider (VASP). According to the Telephone Consumer Protection Act, 47 U.S.C. § 227 – Restrictions on use of telephone equipment, the term "automatic telephone dialing system" means equipment which has the capacity to: store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers. Moreover, Vibes, on behalf of the Bills,

16

maintains and operates the Buffalo Bills mobile text message alerts program application using equipment which has the capacity to store or produce telephone numbers to be called, from a list or database of numbers or using a random or sequential number generator and dials these numbers without human intervention. As such, Vibes employed and operated an Automatic Telephone Dialing System (ATDS) as defined in the TCPA and accompanying FCC rules and regulations.

29.     My opinions in this declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems, a detailed understanding of Short Message Service ("SMS") technology, and a detailed understanding of mobile marketing employing SMS technology. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Las Vegas, Nevada, on December 7, 2012.

Randall A. Snyder

17