**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JERRY WOJCIK, an individual, on behalf of
himself and all others similarly situated,

      Plaintiff,

v.                             Case No. 8:12 CV 2414 SDM-TBM

BUFFALO BILLS, INC.,
a New York Corporation,

      Defendant.

_____

**PLAINTIFF'S MEMORANDUM**
**IN SUPPORT OF HIS MOTION FOR CLASS CERTIFICATION**

## I.    INTRODUCTION

      This matter presents a textbook case for class certification. Through a common course

of conduct, Defendant Buffalo Bills, Inc.[1] ("Defendant" or "BBI"), operated a text message

alert service ("Bills Text Alert Program"), which unlawfully sent unauthorized text messages

through the use of an automatic telephone dialing system ("ATDS") to tens of thousands of

consumers without their prior express consent. Simply put, Defendant represented to each

and every class member, including Plaintiff, that they would receive no more than five (5)

text messages during any one week period; however, over four years they violated that

---

[1] The Buffalo Bills are a football franchise whose professional team plays in the National Football League and, according to Forbes magazine, was worth approximately $805 million dollars as of 2012. http://www.forbes.com/teams/buffalo-bills/ (last accessed: June 17, 2013).

promise no less than forty-seven (47) times.[2] Through this uniform course of conduct, BBI repeatedly violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"), thereby entitling those consumers to statutory damages and injunctive relief.

## II.   FACTUAL BACKGROUND

The Bills Text Alert Program involves sending out "mobile alerts," which are recurring programs in which text messages are sent *en masse* automatically to persons within a subscribed database. Pl.'s Compl. [DE 1] ¶ 14. Each of the putative class members provided their cellular telephone number to BBI by texting the word "BILLS" to short code 64621, which is the only way to subscribe to the text alert program. Pl.'s Compl., ¶ 16; Pastore Dep., 11:23-25, 12:8-17.

After each class member subscribed to the Bills Text Alert Program, BBI sent the following Mobile Terminating text message: *Thanks for joining BILLS alerts, you will receive up to 5 msgs/week. U r also entered 2win tix & merch! Text STOP 2 quit, HELP 4 help. Msg&data rates may apply. See* Plaintiff's Complaint [DE 1] ("Pl.'s Compl."), ¶ 19; Deposition of Gregg Pastore, attached hereto as Exhibit 1 ("Pastore Dep"), 38:22-25.[3] Plaintiff (like every class member) received the Mobile Terminating text message after subscribing to the service. Pl.'s Compl., ¶ 19; Pastore Dep., 23:16-25, 38:19-25; Deposition of Jerry Wojcik, attached hereto as Exhibit 2 ("Wojcik Dep."), 81:1-8, 97:7-15. The program

---

[2] That more five text messages were sent during 47 individual weeks is based upon a spreadsheet produced confidentially by BBI. While the spreadsheet remains confidential, BBI's counsel has informed Plaintiff's counsel that it agrees that the conclusions drawn by Plaintiff are not confidential. Plaintiff does not anticipate BBI disputing this conclusion; however, if it does, Plaintiff will provide the confidential document to the Court without delay.

[3] By definition, all members of the putative class received more than five (5) text messages during one or more weeks. Pl.'s Compl., ¶ 24.

was designed so that all subscribers would receive the Mobile Terminating message. Pastore

Dep., 40:16-17, 73:10-21. In its *U.S. Consumer Best Practices for Messaging* guidelines, the

Mobile Marketing Association ("MMA") states:

> After opt-in to a recurring program, a confirmation Mobile Terminating (MT)
> message must be sent to the subscriber containing, at minimum, the following
> information:
>
> a) Service description
> b) Additional carrier costs (e.g. Msg&Data Rates May Apply)
> **c) Frequency of messaging**
> d) Customer support information (HELP)
> e) Opt-Out information (STOP)

MMA, U.S Consumer Best Practices for Messaging at 9 (Oct. 16, 2012) (emphasis added),[4]

BBI's mobile marketing facilitator, Vibes Media, LLC ("Vibes"), has stated under oath,

"When designing our services, Vibes considered the generally accepted industry practices as

promulgated by the Mobile Marketing Association . . . ." *See* Declaration of Charley Cassell,

filed at DE 6-1 ("Cassel Decl"), ¶ 4.

  As part of the Bills Text Alert Program, each of the putative class members received

the exact same text message alerts of team news from short code 64621. Pl.'s Compl., ¶¶ 6,

25, 28; Pastore Dep, 12:8-17; 12:21-22. Each Mobile Terminating message sent by BBI as

part of the Bills Text Alerts Program was sent *en masse* by an ATDS maintained by Vibes,

which has the capacity to store or produce telephone numbers to be called using a random or

sequential number generator and to dial such numbers. Pl.'s Compl., ¶ 24; Declaration of

Randall A. Snyder, filed at DE 12-2 ("Snyder Decl. (December)"), ¶ 6, 24. When a class

member "opts-in" to the Bills Text Alert Program, BBI, through its agent Vibes, records and

---

[4]  Available at: http://www.mmaglobal.com/files/uploads/Consumer-Best-Practices.pdf

saves the cellular subscribers' phone numbers on a server for the purpose of enabling BBI to send text messages to that number. Snyder Decl. (December), ¶ 16; Cassell Decl., ¶ 8; Pastore Dep., 18:18-20; Deposition of Charley Cassel, attached hereto as <u>Exhibit 3</u> ("Cassel Dep"), 27:21-24, 28:1-7; Cassell Decl., ¶ 8. The database has the ability to draw numbers at random. Cassell Dep., 90:09-13, 23-24. BBI used a web portal to send uniform texts messages *en masse* to every subscriber in the Bills Text Alert Program. Cassell Decl., ¶ 3, 6; Pastore Dep, 14:8-17. This web portal is the only way that BBI can send the text messages *en masse*, and it involves no manual dialing of telephone numbers. Pastore Dep, 14:18-23. It should be undisputed that the text messages at issue here were sent using an ATDS.[5]

BBI's website, terms and conditions, and confirmatory text message all state unequivocally that the subscriber's consent will be limited to the receipt of no more than five (5) text messages during any one week period.  Pl.'s Compl., ¶ 20;  Declaration of Jerry Wojcik, filed at DE 12-1 ("Wojcik Decl."), ¶ 3; Wojcik Dep., 32:17-21, 36:23-25, 38:1-7, 40:1-5. No advertisements or other media contained different terms. Pastore Dep, 47:2-12.

Yet, Plaintiff (like every class member) received more than five text messages from BBI during certain weeks. Pl.'s Compl., ¶ 21; Pastore Dep., 14:19-23, 23:9-10, 32:1-33:9. All of the text messages were sent from short code 64621. Pl.'s Compl., ¶ 22; Pastore Dep., 23:9-10, 14:19-23. Each and every text message sent by BBI to Plaintiff was sent to all subscribers at the same time. Pastore Dep., 16:18-20, 26:16-18, 33:6-9, 19-25, 34:23-25; *Wojcik v. Buffalo Bills*, No. 13-mc-00025, April 5, 2013, Hearing Transcript, attached hereto

---

[5] Vibes's system retains data regarding its executed campaigns forever. *Id.*, 34:6-8. Vibes knew that some people were charged for texts. *Id.*, 71:4-6. Vibes' system has no kind of program or tickler to inform BBI if it was exceeding a certain number of texts for a certain time period. *Id.*, 51:1-7.

as <u>Exhibit 4</u> (April 5, 2013 Hearing), 35:5-17; Snyder Decl. (December), ¶ 24. BBI lacks the ability to specifically text an individual subscriber. Pastore Dep., 16:18-10.

The putative class contains at least 20,000 people. *See* BBI's Amended Responses to Plaintiff's First Request for Admissions, attached hereto as <u>Exhibit 5</u>, ¶ 9; Pastore Dep. 68:10-22.[6] The putative class size may be as high as 43,203.[7]

Accordingly, Plaintiff on behalf of the putative class seeks $500 in damages for each TCPA violation, as well as treble damages for willful or knowing violations of the law, and injunctive relief, pursuant to 47 U.S.C. § 227(b)(3). Wojcik Dep, 98:9-20. Plaintiff also seeks to certify a nationwide class consisting of all persons in the United States who received more than five (5) of the previously described unsolicited text message alerts from BBI in a given week (as further defined herein).

**C.     The Proposed Class.**

As a result of BBI's uniform conduct described above, Plaintiff brought the instant lawsuit and now seeks certification of a nationwide class defined as follows:

<u>**The Buffalo Bills Text Message Alert Service Class**</u>[8]

All persons in the United States who subscribed to receive Buffalo Bills text message alerts from short code 64621 and were subsequently sent more than five (5) text messages during any one week period from Defendant or by

---

[6] BBI admitted at deposition that the class size is "within the twenty/thirty thousand range." Pastore Dep. 68:10-22.

[7] BBI has produced a spreadsheet purporting to be a comprehensive list of all subscribers participating in the program for each year of the class period, which contains 43,203 unique cellular telephone numbers. *See* Declaration of Randall A. Snyder, attached hereto as <u>Exhibit 6</u> ("Snyder Declaration (June)"), ¶ 7. Plaintiff has not attached a copy of this spreadsheet, as it contains more than 750 pages of telephone numbers. Should BBI dispute the numbers claimed by Plaintiff, a copy of the spreadsheet can be provided to this Court without delay.

[8] The above-cited Class definition excludes BBI, their legal representatives, assigns, and successors, and any entity in which the BBI has a controlling interest. Also excluded from the Class are any employees of Vibes Media, LLC, the Judge to whom this case is assigned as well as the Judge's immediate family.

another party on behalf of Defendant to their cellular telephone wherein said text messages were sent using an automatic telephone dialing system or a device which has the capacity to be used as same during the four year period prior to the filing of the complaint in this action through the date of certification.

As demonstrated below, the proposed class meets each of Rule 23's requisites to certification; therefore, the instant motion should be granted in its entirety.

## III.   ARGUMENT

### A.  Standard for Class Certification

In order for a class to be certified, all four requirements of Rule 23(a) must be satisfied along with one of the three categories of Rule 23(b). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997).  In deciding a motion for class certification, the court must accept all allegations of the complaint as true. *Neumont v. State of Florida*, 198 F.R.D. 554, 557 (S.D. Fla. 2000). "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009). However, merits determinations should be avoided "to the extent practicable." *Id.*

"Rule 23 is to be given a liberal rather than a restrict interpretation." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 40 L.Ed.2d 732, 743, 94 S.Ct. 2140, 2148 (1974). *See also King v. Kansas City Southern Industries*, 519 F.2d 20, 25-26 (7th Cir. 1975) (Rule 23 must be read to "favor maintenance of class actions.").

**B.   The Proposed Class Satisfies the Requirements of Rule 23.**

At the outset, it should be noted that actions under the TCPA are frequently certified as class actions within the State of Florida. *Manno v. Healthcare Revenue Recovery Group, LLC*, 2013 U.S.Dist.LEXIS 52620 (S.D.Fla., Mar. 26, 2013) (cellular telephone calls); *Kertesz v. Rick's Cabaret International, Inc.*, Case No. 0:11-cv-61289, DE 36 (S.D.Fla., April 23, 2012) (text messages); *Espinal v. Burger King Corp.*, Case No. 1:09-cv-20982, DE 61 (S.D.Fla., May 25, 2010) (text messages); *Mais v. Gulf Coast Collection Bureau, Inc.*, ---F.Supp.2d ----, 2013 WL 1899616 (S.D.Fla. May 8, 2013).  TCPA cases involving cellular telephones are routinely certified elsewhere, as well. *Meyer v. Portfolio Recovery Assocs., LLC*, 2012 U.S. App. LEXIS 26708, *9 (9th Cir. 2012) (affirming class certification of a TCPA cell phone class); *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (certified a cell phone TCPA case and rejected arguments that problems in identifying class members defeat certification.); *Balbarin* v. *North Star Capital Acquisition, LLC,* Case No. 10 C 1846,2011 U.S. Dist. LEXIS 686 (N.D. Ill. Jan. 5,2011); *Mitchem* v. *Illinois Collection Service, Inc.,* 09 C 7274, 2011 U.S. Dist. LEXIS 714 (N.D. Ill., Jan. 3,2011); *Pesce v. First Credit Services, Inc.*, 11 C 1379 (N.D. Ill., Dec. 19, 2011) (later decertified because of an issue unique to plaintiff).[9]

---

[9] Additionally, Numerous cases have been certified as class actions under the junk faxing provisions of the TCPA, which involve issues similar to this case.  *See Hinman v. M and M Rental Center* Inc., 545 F. Supp. 2d 802 (N.D. Ill. 2008); *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F.Supp. 2d 894 (N.D. Ill. 2010); *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 U.S. Dist. LEXIS 125842, 2010 WL 4931001, at *2-3 (N.D. ll. Nov. 29, 2010); *CE Design, Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 CV 5953, 2009 U.S. Dist. LEXIS 73869, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009); *Green v. Service Master*, No. 07-CV-4705, 2009 U.S. Dist. LEXIS 53297, 2009 WL 1810769 (N.D.Ill. June 22, 2009); *Holtzman v. Turza*, No. 08 C 2014, 2009 U.S. Dist.

### 1.   Rule 23(a)(1) – Numerosity

Numerosity is satisfied when the size of the putative class renders joinder impracticable. *Hammett v. Am. Bankers Ins. Co. of Florida*, 203 F.R.D. 690, 693 (S.D. Fla. 2001). Joinder is presumptively impracticable where a putative class contains more than forty persons. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553-57 (11th Cir. 1986). "[W]here the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable." 3 *Newberg on Class Actions* § 7.22 (4th ed. 2002).

Here, BBI has admitted on multiple occasions that the putative class contains in excess of 20,000 members. Pastore Dep, 68:10-22. *See also* footnote 7. Additionally, Plaintiff has already identified 47 weeks during which BBI sent more than five text messages to all subscribers; therefore, it can easily be determined which weeks resulted in TCPA violations, and which subscribers were members during those violative weeks.

Thus, the proposed Class consists is far in excess of the numerosity requirement of Fed. R. Civ. P. 23(a)(1).

### 2.   Rule 23(a)(2) – Commonality

The second prerequisite to certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1355 (11th Cir. 2009). "[T]he threshold necessary to satisfy the commonality prong is

---

LEXIS 95620, 2009 WL 3334909 (N.D.Ill. Oct. 14, 2009); *G.M. Sign, Inc. v. Group C Communs, Inc.*, No. 08-CV-4521, 2010 U.S. Dist. LEXIS 17843, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010).

not onerous." *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 650 (S.D.Fla. 2008). To meet the commonality requirement, the representative plaintiff is required to demonstrate that the proposed "class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotes omitted). In other words, commonality requires that the claims of the class "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Even so, "[t]he threshold for commonality is not high." *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 691 (S.D. Fla. 2006) (quoting *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003)). "Not all factual or legal questions raised in the litigation need be common so long as at least one issue is common to all class members." *Fuller v. Becker & Poliakoff, P.A.*, 197 F.R.D. 697, 700 (M.D. Fla. 2000). "A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Kornburg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 695 (M.D. Fla. 2005).

Here, Plaintiff's affirmative claims and those of the proposed class are based upon the same identical issue: whether or not that BBI violated the TCPA when it sent more than five texts per week when its terms only allowed up to five. Regardless of whether not Plaintiff correct, this is a common issue for all class members. Because BBI engaged in standardized conduct towards Plaintiff and the proposed class, the alleged violations may be proven

through the use of common and generalized evidence applicable to the proposed class as a whole.

As an example of this standardized conduct, BBI has admitted that all members of the proposed class joined the Buffalo Bills Text Alert Service in the same manner and all immediately were sent the same confirmatory text message. Pl.'s Compl. ¶ 19; Pastore Dep.,11: 23-25; 23:24-25; 24:11-16. Likewise, BBI has admitted, both itself and through counsel, that all of the text messages sent by BBI as part of the Buffalo Bills Text Alert Service were identical in content and were sent by the BBI in the same exact manner. April 5, 2013 Hearing, 35:5-17; Pastore Dep, 14:9-15, 14:19-20, 16:11-13, 16:18-20. Regarding the requirement of using an ATDS, every text was sent using the same software and hardware; therefore, whether the texts were sent using an ATDS will determined by the use of common and generalized evidence applicable to the proposed class as a whole.

BBI likely will argue that "consent" bars recovery in this case, as well as class certification. Significantly, however, "consent" is not an individual issue because there is no individual issue of whether a class member consented. Indeed, the scope of each class member's consent is precisely the same, and that scope turns on a single legal question: Did the confirmation text message establish consent only to receive at most five texts per week? Therefore, any issue regarding consent is a legal issue and is the same for every class member.[10]

---

[10] A recent California case supports Plaintiff's argument here. In *Weiss v. The Pittsburgh Penguins*, No. CV 12-4585 CBM, DE 45, C.D.Cal., Nov. 26, 2012, attached hereto as <u>Exhibit 7</u>, the court found consent to be a single legal issue that would apply class-wide. In *Weiss* the terms expressly allowed for an unrestricted number of texts "after every game", (p. 2), "*plus* up to three 'further' promotional text messages a week." p. 4 (emphasis in

BBI may claim that there are individualized issues with respect to the issue of consent because it promoted the Buffalo Bills Text Alert Service through various advertisements. However, none of those advertisements contained any terms or conditions. Pastore Dep, 47:2-12. The only exception is BBI's website, which mirrored the terms contained in the confirmation text message, *i.e.*, that every subscriber, including Plaintiff and every class member, would receive only up to five text messages per week. Pastore Dep, 47:20 – 50:9.

The only statement of terms - the one that 'seals the deal' between the parties - is the confirmation Mobile Terminating text message, which every applicant receives upon notification that they've been accepted into the program.[11] *See* Pastore Dep, 23:7- 24:16. This case is distinguishable from the cases that find that consent may be an individual issue where consent was determined by whether or not an individual class member actually provided the number called. In this case, every putative class member provided their number and that question is not relevant to whether or not the confirming text establishes the scope of consent.

It is Plaintiff's position that the confirmatory text (which was sent to every putative class member) defines the scope of prior express consent given by the proposed class to receive future text message alerts from BBI. This position is in line with the common sense approach courts have adopted in matters concerning the TCPA; since consumers might become aware of the Buffalo Bills text message alert service by various measures (e.g.,

---

original). Here, the programs' terms established Plaintiff's and the class members' consent to receive up to five texts per week.  *Weiss* confirms that the issue of "consent" as a defense is a single legal issue that is applicable uniformly to every class member. As such, BBI's possible "consent" defense has no bearing on the class certification analysis.

[11] Again, to the extent that the website's terms are relevant, they mirror the confirmation text's restriction of up to five text messages per week.

word-of-mouth, banner advertisements, Twitter, Facebook, etc.), the only way to universally assure that each consumer is provided the identical terms regarding text message frequency is via the Mobile Terminating message. Again, BBI has admitted that the Mobile Terminating text message is sent to every subscriber upon subscribing to short code 64621 since well before 2008, and that the message's substance has remained consistent during that time. *See* Pastore Dep, 23:7- 24:16;[12] *See also Downing v. Papa John's USA, Inc.*, Case No. 12-cv-422, 2013 U.S. Dist. LEXIS 72748, *2 (E.D. Va. May 15, 2013) (holding that "decision not to elect to receive promotional text messages constituted an instruction to the contrary informing Defendants not to send promotional texts"); *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 695 (M.D. Fla. 2005) (pronouncing that "[c]ommonality may be established where there are allegations of common conduct or standardized conduct by the defendant directed toward members of the proposed class") (citation and internal quotations omitted).[13]

"Where there are objective indicia of the contract's terms . . . the manner in which parties become aware of a contractual opportunity and their subjective perceptions of the resulting contract are not relevant." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413-14 (N.D. Ill. Mar. 7, 2012).   In *Boundas*, Abercrombie & Fitch offered $25 promotional gift cards to customers who spent $100 or more in one transaction. *Id.* at 411.

---

[12] It is well-established in TCPA case law that the scope of consent may be similarly limited in nature. In the seminal case of *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), the court relied upon the terms and conditions associated with the opt-in process in determining the scope of consent. *Id.* at 955. Ultimately, the court held the plaintiff had not consented to receive texts from Simon & Schuster stating, "Satterfield solely consented to receiving promotional material from Nextones or their affiliates and brands … [t]he record confirms that Nextones neither owns nor controls Simon & Schuster, nor can Nextones be considered a Simon & Schuster subsidiary." *Id. See also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 12-143, November 26, 2012, attached hereto as <u>Exhibit 8</u>.
[13] *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (S.D.N.Y. 2008) (collecting cases holding that claims arising out of form contracts are especially appropriate for class actions).

Even though the cards themselves reflected no expiration date, Abercrombie argued that the "no expiration date" clause on the back of the cards was preempted by a contrary note that appeared on the sleeve the cards were enclosed in when they were given to qualifying consumers. *Id.* Customers learned about the gift cards through various means - online advertising, in-store sales staff, some learned about the card only when they were given one after a qualifying purchase. *Id.* at 414. In finding in favor of commonality, the *Boundas* court noted that when Abercrombie customers made qualifying purchases and received promotional gift cards, regardless of how they came to know of the cards, contracts—identical contracts—were formed. *Id.* Here, any argument by Defendant that commonality should be defeated by virtue of the several different ways in which class members potentially became aware of the Bills' text messaging program misunderstands Plaintiff"

Regardless of how one became aware of the Defendant's text messaging program, or what specific ad prompted their interest in receiving informational texts, each and every "member" of the text messaging program, like the gift card recipients in *Boundas,* entered into identical "contracts," based upon the language in the confirmatory text that every member received, especially as none of the advertisements had any terms contrary or inconsistent with the confirmation text.

BBI's conduct raises common legal issues which include the following:

- Whether the confirmation "Mobile Terminating" text message sent by BBI defines the scope of consent;

- Whether subscription to the Buffalo Bills mobile alert service constitutes a contract between the parties;

- Whether BBI's conduct violates the TCPA; and

13

- Whether the Class members are entitled to treble damages based on the willfulness of BBI's conduct.

The commonality requirement is satisfied as every proposed class member joined the Mobile Alert Service in the manner, received the same confirmation text, agreed to the same terms and limitations on the weekly number of messages, and was sent the same text messages by Defendant in the same manner. Accordingly, every proposed member's claim will be resolved on a determination of whether the text were sent with an automatic telephone dialing system and whether the confirmation text defines the scope of express consent provided by the proposed class members. *See Dukes*, 131 S. Ct. at 2551.

### 3. Rule 23(a)(3) – Typicality

Typicality, the next requirement under Rule 23, requires that Plaintiff's claims be typical of those of the other Class members.  Fed. R. Civ. P. 23(a)(3). "[T]ypicality measures whether a significant nexus exists between the claims of the named representative and those of the class at large."   *Hines v. Widnall,* 334 F.3d 1253, 1256 (11th Cir. 2003) (internal quotation omitted).   Yet, the "[c]lass members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" *Ault v. Walt Disney World Co.,* 692 F.3d 1212, 1216 (11th Cir.2012) (quoting *Prado–Steiman v. Bush,* 221 F.3d 1266, 1278–79 (11th Cir.2000) (internal alterations omitted). The required nexus exists "if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *See Ault,* 692 F.3d at 1216 (quoting *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984)). "Thus, typicality is often met when, in proving

her case, the representative plaintiff establishes the elements needed to prove the class members' case." *Colomar v. Mercy Hosp., Inc.,* 242 F.R.D. 671, 677 (S.D.Fla.2007). While commonality and typicality are related, the Eleventh Circuit has "distinguished the two concepts by noting that, [t]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class." *See Vega,* 564 F.3d 1256, 1274 (11th Cir. 2009) (quotes omitted).

In the present case, Plaintiff and the proposed Class were each subject to Defendant's uniform course of conduct. That is, each opted in to the Bills Alert program, each received the confirmation text with the terms and conditions, and each were sent one or more text messages in excess of Defendant's stipulated limitations. Hence, in order to prove his own claim, Mr. Wojcik will be required to prove that he texted the word "BILLS" to the short code 64621,[14] was sent the aforementioned Mobile Terminating message, and thereafter received more than five text messages during any one week period. *See* DE-1; ¶¶ 19, 21-22. In precisely the same manner, Plaintiff will need to prove the same elements for the class members' claims. This will not be difficult, since Defendant has admitted that all class members are sent the same confirming text message containing the 5 message/week limitation and that all class members (including Plaintiff) are sent the same messages.

As a result of Defendant's uniform conduct, Plaintiff and the other members of the classes are entitled to statutory damages under the TCPA based on Plaintiff's claims, which

---

[14] Plaintiff initially believed that he opted into the Bills Alert program via the website, but later clarified that he signed up for the service by texting "BILLS" to the short code 64621. Wojcik Dep, 99:6-16. BBI does not dispute that he signed up through the short code, as BBI testified that Mr. Wojcik and every class member signed up for the service in precisely the same manner, *i.e.,* by texting "BILLS" to the short code 64621. Pastore Dep, 12:8-17.

are typical of the putative class members' claims. Consequently, by pursuing his own claims, Plaintiff will necessarily advance the interests of the proposed Class in satisfaction of Rule 23(a)(3)'s typicality requirement.

### 4.   Rule 23(a)(4) – Adequacy of Representation

Finally, Rule 23(a) requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  To meet this requirement the proposed class representative must not have any interests antagonistic to those of the other members of the class and he or she must be represented by competent counsel. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726-28 (11th Cir. 1987).

In this case, Plaintiff has the same interests as the other members of the classes.  He received unauthorized text messages from Defendant on his cellular phone as a result of Defendant's uniform course of unlawful conduct. Indeed, every class member consented to receive, at most, five texts per week; however, Plaintiff has identified 47 weeks during which it sent every class member more than five texts per week. *See* footnote 17.  Therefore, like all the members of the class, his interests lie in ensuring that Defendant's unlawful conduct does not continue in the future and that he and the other members of the class recover the statutory damages and injunctive relief to which they are entitled.   Plaintiff has no interests antagonistic to those of the class.  *See* Declaration of Jerry Wojcik, attached hereto as Exhibit 9, ¶¶ 3-12; *see also* Wojcik Dep, 94:16 – 96:23; 98:9-20.  Furthermore, Plaintiff has never been convicted of any crime, nor even accused of any crimes. *See* Wojcik Dep, 14:21-24.

16

Similarly, Plaintiff's counsel includes three well-respected members of their respective legal communities. All three have extensive experience in the area of consumer protection and the TCPA, and two of three have extensive class action experience.

James Giardina has been in practice for nearly ten years and is a partner in The Consumer Law Group, PLLC. Mr. Giardina has litigated hundreds, if not thousands, of consumer protection cases. Just in the last two years Mr. Giardina has litigated approximately two dozen cases under the TCPA.

Scott Owens is generally regarded as the leading legal authority in the State of Florida on text message-related TCPA actions.  Moreover, he is currently litigating multiple cases nationally (in several federal district courts) involving the TCPA and related SMS technology issues, has the resources necessary to conduct litigation of this nature, and has been appointed as lead class counsel in at least three other cases in the Southern District of Florida.  (*See* Firm Resume of Scott D. Owens, P.A., a true and accurate copy of which is attached to the Scott D. Owens Declaration as <u>Exhibit 10</u>); *see also In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 620 (M.D. Fla. 2006) (proposed class counsel's previous appointment as lead counsel is instructive).   To the best of the undersigned attorney's knowledge, there is only one other attorney in the entire State of Florida who has litigated more claims under 47 U.S.C. § 227(b)(1)(a)(iii) than himself.

Keith Keogh[15] has litigated dozens of class cases under the TCPA since 2002, and was one of the first attorneys in the country to litigate such cases as class actions. He has

---

[15] On June 3, 2013, Magistrate Judge McCoun III granted the motion for Mr. Keogh to appear *pro hac vice*. (DE 52).

been appointed as class counsel in dozens of TCPA and other consumer protection class actions. Mr. Keogh's qualifications are elaborated further in his Declaration, attached hereto as Exhibit 11.

Proposed class counsel have diligently investigated and dedicated substantial time and financial resources to the investigation of the claims at issue in this action, and will continue to do so throughout its pendency.

Therefore, the adequacy requirements of Rule 23(a)(4) are satisfied.

### 5. Rule 23(b)(3) – Common Questions of Law or Fact Predominate

A class action may be certified under Rule 23(b)(3) if 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Fed.R.Civ.P. 23(b)(3)." *Fitzpatrick*, 635 F.3d at 1282. "Predominance is a question of efficiency" requiring the Court to determine whether it is more efficient "to decide some issues on a class basis or all issues in separate trials." *Butler v. Sears*, 702 F.3d 359, 362 (7th Cir. 2012).  The existence of some individual issues, therefore, does not preclude certification so long as common issues "are more substantial than those subject only to individualized proof." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2nd Cir. 2010).  It is therefore well established that a defendant cannot defeat class certification by making "vague assertions about potential individual issues" without evidentiary support. *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 U.S. Dist. LEXIS 7084, *27 (N.D. Ill. 2011), *citing G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No. 08-CV-4521, 2010 WL 744262, at *4 (N.D. Ill. Feb. 25, 2010).

18

Here, there are no individual issues. Indeed, all class members, by definition, were sent more than five text messages during any week and all of their claims succeed or fail on the sole legal question of whether the confirmation text establishes the scope of consent. The questions of law and fact common to the class members are the only questions of law and fact here; as such, they predominate over any questions involving individual members, of which there are none (other than the ministerial act of identifying the class member names).[16]

### 6.  Rule 23(b)(3) – A Class Action is Superior to Other Available Methods to Resolve this Controversy

Rule 23(b)(3) also requires that the class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Little v. T-Mobile USA, Inc.*, 491 F.3d 1302, 1304 (11th Cir. 2012). Efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented.

The Court determines the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992).  It is proper for a court, in deciding the "best" available method, to consider the "... inability of the poor or uninformed to enforce their rights" and "the improbability that large numbers of class members would possess the initiative to litigate individually." *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 318

---

[16] Once again, there is no individual issue of consent. However, even if there appeared to be, consent is not an individual issue. To the extent that this Court finds consent to be an individual issue, it does not predominate over common questions. *See Green*, 2009 U.S. Dist. LEXIS 53297 at *6 (Noting that such an argument "...would wipe away the ability to bring a class action under the TCPA or any statute in which a defendant might raise the issue of the plaintiffs' consent."); *Paldo Sign*, 2010 U.S. Dist. LEXIS 125842; *Garrett*, 2010 U.S. Dist. LEXIS 108339; *Targin Sign*, 679 F. Supp. 2d 894 (N.D.Ill. 2010); *Cy's Crabhouse, 259* F.R.D. 135 (N.D. Ill. 2009); *Finish Thompson, Inc.*, 2009 U.S. Dist. LEXIS 73869 *5; *Hinman*, 545 F. Supp. 2d 802; *Sadowski*, 2008 U.S. Dist. LEXIS 41766 ; *G.M. Sign, Inc. v. Franklin Bank*, S.S.B, 2008 U.S. Dist. LEXIS 79827, 2008 WL 3889950, at *7 (N.D. Ill. 2008).

(S.D.Fla. 2001).  *See also Goldman v. First Nat's Bank of Chicago*, 532 F.2d 10, 15 (7th Cir. 1976).

"In determining superiority, courts also consider the anticipated amount of recovery for each plaintiff.  Class actions are particularly appropriate where multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiff.  *See* Advisory Committee Note to 1996 Amendment to Rule 23."  *Israel v. Avis Rent-a-Car Sys.*, 185 F.R.D. 372, 387 (S.D.Fla. 1999).  In this case, TCPA claims are not fee shifting and even though statutory damages may be available, they are wholly insufficient to warrant counsel filing individual lawsuits.

For the class in this case, the interest of the class members in individually controlling the prosecution of separate claims is small because the class members are likely unaware of their rights and have limited damages such that it is not likely that they would bring individual actions.  "[O]ne of the primary functions of the class suit is to provide a device for vindicating claims which, taken individually, are too small to justify legal action but which are of significant size if taken as a group."  *Brady v. LAC*, *Inc.*, 72 F.R.D. 22, 28 (S.D.N.Y. 1976).

The special efficacy of the consumer class action has been noted by the courts and is applicable to this case:

> As Professors Wright, Miller, and Kane have discussed in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly  situated.' 7B Wright et al., §1778, at 59; see, e.g., *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ('Class actions . . .

20

> may permit the plaintiffs to pool claims which would be uneconomical to litigate individually.'). The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.

*Lake v. First Nationwide Bank*, 156 F.R.D. 615, 625 (E.D. Pa. 1994).

Management of this class action is likely to present significantly fewer difficulties than those presented in many class actions, *e.g.,* for securities fraud.  As cited above, class actions under the TCPA are routinely certified. *See supra* at p. 7 and footnote 9.  See also, *Manno v. Healthcare Revenue Recovery Group, LLC*, 2013 U.S.Dist.LEXIS 52620 (S.D.Fla., Mar. 26, 2013) (rejecting so-called annihilation defense in order certifying TCPA class action, declaring that "[w]hile Defendants may face a potentially larger liability in a class action, it does not follow that any damages awarded would be disproportionate."). Therefore, a class action is the superior method for the fair and efficient adjudication of this controversy.

### 7.   The Class is Adequately Defined and Clearly Ascertainable

"In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (citations omitted).  "Class members need not actually be ascertained prior to certification, but each individual's class membership must be ascertainable at some stage in the proceeding."  *Bush v. Calloway Consol. Group River City, Inc.*, 2012 U.S. Dist. LEXIS 40450, *11 (M.D. Fla. 2012).   In other words, "a class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Catron v. City of St. Petersburg*, 2010 U.S. Dist. LEXIS 35193, *4 (M.D. Fla. 2010); s*ee also Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 659 (M.D. Fla. 2001). Thus, "it is not fatal for class definition purposes if a court must inquire into individual

records, so long as the inquiry is not so daunting as to make the class definition insufficient." *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (TCPA text class certified), citing *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008). Rather, "the class simply must meet a minimum standard of definiteness which will allow the trial court to determine membership in the proposed class." *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003)

Typically, "an identifiable class exists if its members can be ascertained by reference to objective criteria, [whereas] a class definition that requires the Court to assess subjective criteria, like the class members' state of mind, will not be certified." *Lau v. Arrow Fin. Servs.*, LLC, 245 F.R.D. 620, 624 (N.D. Ill 2007).  For instance, a class made up of "residents of this State active in the 'peace movement'" was not clearly ascertainable without evidence of objective criteria by which to determine whether someone was "active" in the "peace movement." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).  Similarly, a class comprised of "homeless" persons and defining the word "homeless" in part as "anyone living in a hotel due to the lack of alternative adequate accommodations" "failed to precisely delineate the people who constitute the class" as the definition "necessarily requires an exhaustive (and exhausting) factual determination of *the reason for* a person's selecting a hotel (as some affluent persons might) as a residence," which is obviously a subjective rather than objective criteria.  *Catron*, 2010 U.S. Dist. LEXIS 35193 at *7-8 (emphasis added).

In this case, however, there are numerous administratively feasible methods of ascertaining the class by reference to objective criteria.  As shown above, Plaintiff has already obtained all of the data necessary to identify the list of cellular telephone numbers

that "subscribed to receive Buffalo Bills text message alerts from short code 64621 and were subsequently sent more than five (5) text messages during any one week period" by reference to Vibes's business records.[17] *See* footnote 17.  That list of cellular telephone numbers identifies the class because the class members are those who were assigned those cellular telephone numbers during the 47 weeks that Defendant sent more than five text messages. *See* footnote 17.

Numerous courts have found classes to be ascertainable in nearly identical circumstances. *See e.g.*, *Targin Sign Sys. v. Preferred Chiropractic Ctr. Ltd*., 679 F.Supp.2d 894, 897-98 (N.D. Ill. 2010)(every fax number represents a subscriber, and the fact that a transmission sent to those fax numbers will consequently make it possible to match names and other relevant information through the numbers themselves is the definitive answer to the fallacious [identification] argument by Preferred's counsel."); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 U.S. Dist. LEXIS 73869, *12, 23 (N.D. Ill. 2009)(finding a TCPA class to be ascertainable in  similar circumstances because "GM Sign can use the fax numbers on the transmission logs to determine the identity and contact information of its class members"); *G.M. Sign v. Franklin Bank, S.S.B.*, 2008 U.S. Dist. LEXIS 79827, *7 (N.D. Ill. 2008) ("Though the logs do not definitively establish the identities of the recipients without further investigation on the part of class counsel, they provide enough information to enable counsel to locate them.")

---

[17] Plaintiff has obtained complete lists of every cellular telephone number subscribing to receive text message alerts for each year 2008, 2009, 2010, 2011, and 2012.  Plaintiff has identified 47 weeks during which time more than five text messages were sent to every single subscriber. An objective and ministerial analysis of that data will identify the class members: any person subscribing to the service during any one of those 47 weeks is a class member.

To the extent that Plaintiff needs to show that it is also administratively feasible to identify the names and/or addresses of the particular persons who were assigned those cell phone numbers at the time of the texts, there are a number of methods of doing so:

First, Plaintiff could subpoena the top eight wireless carriers (which cover 97% of the market[18]) to identify whether the numbers were assigned to their service at the time of the calls and the name of the subscribers at that time.  According to Plaintiff's expert, this method is straightforward and highly effective. *See* Snyder Declaration (June), ¶ 8, 11.

Second, Plaintiff could utilize a public records search service, such as Lexis Nexis or Neustar, to identify the persons who used those numbers at the time according to public record.  According to Plaintiff's expert, this method is reliable, as the rate of transfer ("churn rate") is less than 2%. Snyder Declaration (June), ¶ 12.   Several courts have explicitly approved this method of using a public records search to identify class members from a list of phone numbers.  *See Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 276 (D. MD. 2012) (approving of use of a skip tracing service to locate class members from a list of phone numbers). *See also Rojas v. Career Education Corp*, (N.D. Ill. 2010) (10-cv-5260)(approving use of a "commercially reasonable reverse cell phone number look-up service" to locate class members).

---

[18] *Comscore, Mobile Future in Focus 2012*, attached hereto as <u>Exhibit 12</u>, p. 15.

Finally, any recipient of class notice in this action[19] could simply be required to show in a claim form that they were the user of the cell phone number at the time.  Several courts have explicitly approved this method of using a claim form to assess class membership.[20]

Each of these options, or any combination thereof, is an administratively feasible method of identifying the class. The list of cellular telephone numbers compiled from Vibes's data identifies the numbers that "subscribed to receive Buffalo Bills text message alerts from short code 64621 and were subsequently sent more than five (5) text messages during any one week period" and thus identifies the class. That list of numbers further allows the court to determine whether any particular individual is a class member by reference to objective criteria.  The class is thus "adequately defined and clearly ascertainable."

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Jerry Wojcik respectfully requests this Court to grant his motion for class certification, appoint him as class representative, and appoint his counsel as class counsel.

---

[19] Such notice would be sent to the persons identified as the subscribers via a public records search or by the subpoenaed wireless carriers.  Notice could also be sent by simply text messaging the cellular telephone numbers at issue by using one of the allotted texts per week.

[20] *See e.g., Bush v. Calloway Consol. Group River City, Inc.,* 2012 U.S. Dist. LEXIS 40450, *15-18 (M.D. Fla. 2012)(finding class to be ascertainable because persons could respond to class notice with a billing statement showing a purchase from the defendant); *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 147 (N.D. Ill. 2010) (finding class to be ascertainable because partial credit card information in defendant's records could "be used to verify whether any individual who responds to class notice is in fact a member of the class"); M*acarz v. Transworld Systems, Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000)(finding class to be ascertainable because any questions about whether a person responding to class notice "can be remedied through proper drafting of the claim form.");  *CE Design v. Beaty Constr. Inc.*, 2009 U.S. Dist. LEXIS 5842, at *4 (N.D. Ill. Jan. 26, 2009) (certifying a class where the list of victims that were illegally sent an advertisement via fax had been destroyed and noting that "potential plaintiffs that come forward will have to represent to the Court—via affidavit and under the penalty of perjury—that they received the fax on the dates in issue"). Since the underlying phone records have not been destroyed in this case, any claim form process would be even simpler.

Respectfully submitted,

**SCOTT D. OWENS, ESQ.**
*Counsel for Plaintiff*
664 E. Hallandale Beach Blvd.
Hallandale, Florida 33009
(954) 589-0588 Phone
(954) 337-0666 Fax
Florida Bar No. 0597651
scott@scottdowens.com

By: s/ *Scott D. Owens*
Scott D. Owens, Esq.
Florida Bar No. 0597651

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 17th day of June 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this 17th day of June 2013 via U.S. mail and/or some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**SCOTT D. OWENS, ESQ.**
664 E. Hallandale Beach Blvd.
Hallandale, Florida 33009
(954) 589-0588 Phone
(954) 337-0666 Fax
Florida Bar No. 0597651
scott@scottdowens.com

By: s/ *Scott D. Owens*
Scott D. Owens, Esq.
Florida Bar No. 0597651