UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JERRY WOJCIK, an individual, on behalf of
himself and all others similarly situated,

        Plaintiff,

v.

BUFFALO BILLS, INC.,
A New York Corporation,

        Defendant.

**Case No. 8:12-cv-02414-SDM-TBM**

## MEMORANDUM IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Defendant, BUFFALO BILLS, INC., a New York corporation ("BBI"), hereby submits its Memorandum in Opposition to Plaintiff's Motion for Class Certification (Doc. 55) and requests that Plaintiff JERRY WOJCIK's ("Plaintiff") motion be denied.

## I.    INTRODUCTION

### A.    Summary of Argument

It is undisputed that all subscribers to BBI's text alert messaging service (the "Text Service"), including Plaintiff, voluntarily provided their cell phone numbers to BBI for the purpose of receiving informational texts about its NFL team the "Buffalo Bills" (the "Team"). As such, this case does not involve unsolicited text message spam. At no time did BBI contact uninterested individuals, whether through use of a purchased list of cellular phone numbers or random calling. This is a case where the relationship between BBI and each subscriber was prompted by the subscriber. Each subscriber, including Plaintiff, had the ability to voluntarily opt out at any time (something Plaintiff - who remains a subscriber to this day - has never elected to do) by texting a four-letter word, "STOP."

As explained in more detail below, questions of how, why, and under what circumstances each individual Text Service subscriber provided his consent to receive BBI's Text Service messages will manifestly predominate, destroying commonality and typicality. Moreover, the inability to identify the "called party" in order to have actionable conduct under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, renders Plaintiff's proposed class unascertainable. Finally, the necessary individual inquiries relating to identification of class members and the scope of consent make Plaintiff inadequate to serve as class representative, destroy predominance, render the proposed class unmanageable and demonstrate that a class action is not the superior procedure for adjudicating this matter.

## B.    Statement of Facts

Subscribers join the Text Service by voluntarily providing their cellular phone number to BBI; thereafter they receive a confirmatory text message, and they remain active subscribers until texting the word "STOP".[1]  BBI advertises and promotes its Text Service through a variety of different means, including emails, written advertisements, in-game banner ads at Ralph Wilson Stadium (the Team's home field), social media (i.e. Facebook and Twitter), promotions at training camp, and on its Internet website.[2]  The solicitations take many forms, but only the website contains the "3-5" language Plaintiff allegedly relied upon in joining the Text Service.[3]

Plaintiff is a knowledgeable follower of NFL football and a professed fan of the Team.[4] He subscribed to the Text Service on September 12, 2012,[5] in order to get information about the

---

[1]  *See* ¶¶ 8-15 to the Declaration of Gregg Pastore dated July 11, 2013 (the "Pastore Decl.") for a more detailed synopsis of how the Text Service functions **[Exhibit A**, hereto].
[2]  *Id.* at ¶ 16, Exhibits 1, 2, 3, 4, 5 and 6 thereto.
[3]  *Id.*
[4]  Deposition Transcript of Plaintiff Wojcik ("Pl Trans.") at 16:22 to 22:1 **[Exhibit B**, hereto].
[5]  Complaint [DE 1] at ¶ 16.

2

Team "quicker" because such information was important to him "as a fan."[6]  Plaintiff is aware of

and acknowledges that there are peak periods of news concerning NFL teams such as the college

draft, regular season, playoffs, and Super Bowl.[7]  Conversely, Plaintiff admits that when NFL

teams are not in season there is less news concerning teams, including the Buffalo Bills.[8]

Plaintiff contends that upon visiting the Team's website, he viewed a solicitation for the

Text Service, which, in relevant part, stated:

> Get up to the minute news and team alerts sent directly to your phone! …
> To opt in text BILLS to 64621 Verizon Wireless Text Alerts …
> You will be opted in to receive 3-5 messages per week for a period of 12 months.
> Text **STOP** to cancel. Text **HELP** for help."[9]

While acknowledging that the phrase "no more" is not used in this solicitation, Plaintiff

nevertheless contends that this was a promise of no more than five texts per week, and that this

was all he reviewed prior to joining the Text Service.[10]

## II.  ARGUMENT

A "class action is 'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, __ U.S.__, 133 S. Ct.

1426, 1432 (March 27, 2013) (citations omitted).  Plaintiff must prove his proposed class is

ascertainable. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).  It is likewise

Plaintiff's burden to meet each of the requirements of Rule 23(a), and one of the requirements of

23(b).  *Amchen Prods Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  Plaintiff erroneously asserts

---

[6] Pl. Trans., 30:10 to 31:9.
[7] *Id.* at 28:2 to 29:6; and 29:12-14.
[8] *Id.* at 29:6-14.
[9] Complaint [DE 1]. ¶ 17.
[10] Pl. trans., 38:11 to 40:5; 40:14-25; and 100:9-23.

3

that in applying Rule 23 the Court is to employ a liberal pleading standard.[11]  The Supreme Court

has recently made clear that Rule 23:

> 'does not set forth a mere pleading standard' … Rather, a party must not only 'be
> prepared to prove that there are *in fact* sufficiently numerous parties, common
> questions of law or fact,' typicality of claims or defenses, and adequacy of
> representation, as required by Rule 23(a) … The party must also satisfy through
> evidentiary proof at least one of the provisions of Rule 23(b).  *Comcast*, 133 S.
> Ct. at 1432. (citations omitted) (emphasis in original).

Thus, the Supreme Court has instructed that "it 'may be necessary for the court to probe behind

the pleadings … and that certification is proper only if 'the trial court is satisfied, after a rigorous

analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Id*; *see also Wal-Mart Stores,*

*Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011).

Given these recent admonitions, this Court must be vigilant - through rigorous analysis -

to ensure that this case is properly maintainable as a class action.    Plaintiff seeks certification of

a 23(b)(3) class consisting of, in relevant part:

> All persons in the United States who subscribed to receive Buffalo Bills text
> message alerts from short code 64621 and were subsequently sent more than five
> (5) text messages during any one week period from Defendant or by another party
> on behalf of Defendant ….[12]

Plaintiff has failed to meet his burden to satisfy the strict requirements for certification of his

proposed class, and his motion should therefore be denied.[13]

---

[11] Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pl MOL") [DE 55], p. 6.
[12] *Id.* at pp. 5-6.
[13] Plaintiff disingenuously cites to four cases for the proposition that TCPA cases are frequently certified in Florida.
*Id.* at p. 7.  Three of the four cases he cites either involved certification based upon a stipulated class-wide settlement
with the defendant (*Kertesz v. Rick's Cabaret International, Inc.*, Case No. 0:11-cv-61289, DE 36 (S.D. Fla., April
23, 2012); *Espinal v. Burger King Corp.*, Case No. 1:09-cv-20982, DE 61 (S.D. Fla., May 25, 2010)), or did not
even address the issue of certification (*Mais v. Gulf Coast Collection Bureau, Inc.*, --- F. Supp. 2d ----, 2013 WL
1899616 (S.D. Fla. May 8, 2013) (court expressly stayed the case pending interlocutory appeal of its summary
judgment order so as to avoid having the parties expend time and money in briefing a certification motion).  While
the court in the fourth case, *Manno v. Healthcare Revenue Recovery Group, LLC*, No. 11-61357, 2013 WL 1283881
(S.D. Fl. March 26, 2013) did grant certification, it has subsequently stayed the case [DE 202] noting that
interlocutory review would be appropriate due to "the apparent split among the district courts nationwide regarding
issues central to certification in TCPA cases, including individualized inquiries and consent under the TCPA").

### A.     The Proposed Class Cannot Be Ascertained

Prior to granting a certification motion and before determining if a plaintiff has met the four requirements of Rule 23(a), "a plaintiff seeking to represent a proposed class must establish that the class is 'adequately defined and clearly ascertainable.'" *Little*, 691 F.3d at 1304.

### 1.   The Issue of Consent Renders the Class Unascertainable

A class cannot be certified if the plaintiff fails to establish an objective means to determine who is a class member. *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557 (C.D. Cal. 2012).  Here, Plaintiff proposes a class of all subscribers to the Text Service who during any particular week received more than five text messages in that week.

In attempting to make this definition work, Plaintiff glosses over the issue of consent. Plaintiff cannot demonstrate that all members of his proposed class provided their consent and cellphone numbers to BBI under similar factual or legal circumstances.  Instead, Plaintiff suggests that a confirmatory text message - sent by BBI **after** an individual has already subscribed to the Text Service - defines each subscriber's individual consent regardless of the circumstances under which such individual consent was given.[14]  Plaintiff's argument is flawed for several reasons founded both in decisional law under the TCPA and general contract law.

In TCPA actions, courts have denied certification where the Plaintiff has offered no objective means to determine which class members consented to receiving calls. *Gannon v. Network Tel. Servs., Inc.*, No. CV 12-9777-RGK (PJWx), 2013 WL 2450199 (C.D. Cal. June 5, 2013) (denying class certification motion, in part, on the basis that plaintiff's class was unascertainable because it "would require individual inquiry into whether the potential class

---

[14] Pl MOL [DE 55], pp. 10-13.

members consented to receiving text messages"); *accord Vigus v. S. Ill. Riverboat/Casino*, 274 F.R.D. 229 (S.D. Ill. 2011).

Plaintiff's assertion that he was induced to join the Text Service because of the "3-5 messages per week" language on BBI's website is fatal to his motion for certification. Aside from the website, the various solicitations run by BBI for the Text Service did not contain this language. Given the number of alternative means by which the Text Service was promoted (including word of mouth), it is likely that a substantial number of subscribers joined without reliance upon the alleged limiting language central to Plaintiff's claim. Plaintiff fails to demonstrate otherwise, and neither BBI nor Vibes have maintained records identifying subscribers by the solicitation or circumstances that led them to join the Text Service.[15]

In *Vigus, supra*, the unsuccessfully proposed class consisted of persons who had voluntarily given their telephone numbers, knowing that they would receive telephone advertisements from the defendant. Consequently, it was reasonable to believe that putative class members included many people who believed they had given a general consent to be called, who had no gripe with the defendant's calls, and who had no TCPA cause of action. *Id.* at 235. The issues in *Vigus* are similarly present in this action, with the issue of consent being a "highly individualized fact."

### a.   Under the TCPA, Consent is Given at the Time a Subscriber to the Text Service Provides His Number to Defendant BBI

The House Report on what became section 227 states that its calling restrictions do "not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications." 23 F.C.C.R. 559, 564 (*quoting* 23 H.R. REP. No. 102-317 at 17 (1991)). Similarly, the Federal Communications Commission ("FCC") has stated "persons

---

[15] Pastore Decl, ¶17.

who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instruction to the contrary." 7 F.C.C.R. 8752, 8769 (1992).[16, 17]

The <u>voluntary and affirmative</u> act of providing their cell phone numbers to BBI prior to any text message being sent satisfies the TCPA's prior express consent requirement. *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012) (citing numerous cases and recognizing that "authorities are almost unanimous that voluntarily furnishing a cellular number to a vendor or other contractual counterparty constitutes express consent") (citations omitted).

Since consent is given at the time the subscriber provides his number to BBI, subscribers to the Text Service who did not visit BBI's website or did not see the subject language on the website, would have given their consent under markedly different factual circumstances from Plaintiff. In such circumstances, the consent being given would have been general in nature absent express instruction to the contrary by the subscriber. *See generally, Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-02902-CLS, 2012 WL 5511039, * 7 (N.D. Ala. Nov. 9, 2012) (holding that once the plaintiff voluntarily "provided the defendant with his phone number (*i.e.* generally consents), it was [his] responsibility to *explicitly* state the limited scope of [his] consent.").

Plaintiff's misplaced reliance upon *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012), fails to support his contention that the confirmatory text defines each subscriber's consent. *Boundas*, a non-TCPA case involving contract issues under Ohio and

---

[16] *See also*, 23 F.C.C.R. 559, 564 (2008) ("[w]e emphasize that prior express consent is deemed to be granted ... if the wireless number was provided by the consumer ...."); *Meyer v. Portfolio Recovery Assocs., LLC*, 696 F.3d 943, 948 (9th Cir. 2012) ("Pursuant to FCC ruling, prior express consent is deemed granted ... if the wireless telephone number was provided by the consumer ... and ... if it was provided at the time of the transaction").

[17] Effective October 16, 2013, the rule governing prior express consent has been modified by the FCC to require in certain instances of texting that unambiguous written consent be obtained before a text is sent. 27 F.C.C.R. 1830 (2012). This change highlights the FCC's continuing effort to refine its rules to distinguish between wanted informational texts (as here), from purely invasive telemarketing texts.

Illinois law, did not address the central issue of consent presented herein.  Rather, it focused on

whether a national retailer could void gift cards based upon language set forth on the sleeve of

the gift cards that were issued upon the purchase of $100 in merchandise.  As cited above, the

scope of consent under the TCPA is determined immediately at the time the subscriber provides

his cellular telephone number to BBI.  Consent is personal in nature.[18]  If the telephone number

is given without any notice of a limitation on the number of texts to be sent, it must be deemed to

be general.  *Pinkard, supra.*  Thus, the circumstances under which each subscriber gave consent

is an issue incapable of determination without individualized inquiry (i.e mini-trials).  The

inability to make this determination without mini-trials renders the proposed class

unascertainable. The alternative, simply imposing Plaintiff's view on the proposed class, denies

each subscriber the personal right to define his own consent.

> **b.**     **The Confirmatory Text Message is of No Legal Import**

Plaintiff's counsel asserted in open court that the relationship between BBI and each of

its subscribers sounds in contract law.[19]  To the extent that principles of contract law apply,

Plaintiff misconstrues the nature and enforceability of the terms to that contract.[20]

---

[18] *See generally State v. Tripp*, K-99-038397, 2000 WL 675492 *18 (Md. Cir. Ct. May 5, 2000) (holding that "the issue of consent is personal" and not amenable to proof either directly or indirectly from the testimony of a third-party); *In re Adriance*, 69 N.Y.S. 314, 324 (4th Dep't 1901) ("The privilege of consenting or refusing to consent is personal to the property owner").

[19] *See* Exhibit 4 to Pl MOL [DE 55], p 21; 1 20-22.

[20] Under Florida law, the choice of law governing the validity and substantive obligations of a contract are determined by the law of the place where the contract was made. *Jemco, Inc. v. United Parcel Service, Inc.*, 400 So. 2d 499, 500-1 (Fla. 3d DCA 1981) (A "contract is made at the place where the last act necessary to complete the contract is done").  For purposes of this motion, BBI assumes that in analyzing Plaintiff's individual TCPA claim, the "contract" was made while he (a Florida resident) was at home reviewing BBI's website and subscribing to the service, and that Florida law would apply to interpreting this agreement.  This analysis does not apply to instances where purported class members made their individual contracts with BBI while residing in other states.  In such instances, arguably, the law of each such state would apply.  The point is that even if Plaintiff is correct that the scope of consent is defined by an "after-the-fact" confirmatory text, certification must be denied because individual determinations must be made for each class member regarding (1) the individual state law applicable to that class member's scope of consent, and (2) whether the applicable state law permits consideration of the confirmatory text in determining the scope of consent. *See* Section II(C), below.  That Plaintiff resorted to "cherry picking" a case from Illinois to prove the scope of consent in his Florida lawsuit proves this point.

Under Florida law, a contract is made "when three elements are present: offer, acceptance, and consideration." *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197 (Fla. 2d DCA 2012). In addition, "Florida employs the 'mirror image rule' with respect to contracts. Under this rule, in order for a contract to be formed, an acceptance of an offer must be absolute, unconditional and identical with the terms of the offer." *Montgomery v. English*, 902 So. 2d 836, 837 (Fla. 5th DCA 2005). Here, BBI made a myriad of "offers" to subscribers to the Text Service. No offers, other than the offer on BBI's website, contained the "3-5" per week language that Plaintiff purportedly relied upon. Moreover, while Plaintiff contends that "none of those advertisements contained any terms and conditions," even a cursory examination evidences otherwise (i.e. the right to receive "up-to-the-minute" news and alerts about the Team without Plaintiff's purported limiting language).[21]

As noted above, Plaintiff acknowledges that there are peak periods of news concerning the Team.[22] Most fans of the Team would no doubt be aware of such peak periods and logically would be looking forward to receiving as much Team information as possible during those periods.[23] Subscribers to the Text Service usually sign up because they want as much information about Team happenings as fast as they can receive it.[24] If fans did not want such

---

[21] Plaintiff implies that there are strict "best practices" as to the operation of a text messaging program [Pl MOL at p. 3], this contention is belied by the recognition that any guidelines are non-binding, lack uniformity and are continually evolving to deal with situations, such as here, where valuable content is being provided to those who have requested it. *See* pp. 71:7-20 & 99:1-100:6 of the Deposition Transcript of Charlie Cassell [Pl MOL at Ex. 3].

[22] Pl. Trans., 28:2 to 29:14.

[23] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* 27 F.C.C.R. 15391 (2012) ("SoundBite"), the FCC issued an immediately effective Ruling stating that that "the restriction on calls to emergency lines, pagers, and [wireless numbers] <u>does not apply</u> where the called party has provided the telephone number of such a line to the caller for use in normal business communications," i.e. communications that are "expected or desired between businesses and their customers." SoundBite, at ¶ 8. This calls into question whether the TCPA is even applicable where, as here, the recipient of text messages invited the receipt of same.

[24] Pastore Decl., ¶ 18.

"up-to-the-minute" reports on Team activities, they would likely refrain from joining the Text

Service, and instead read the newspaper or catch a news report.

If a subscriber joins the Text Service without awareness or knowledge of the supposed

"3-5" limitation, his acceptance (and therefore his consent) must, by operation of law, mirror the

particular offer to which he was responding. In most instances, that would be simply to receive

"up-to-the-minute" news about the Team.

Plaintiff's focus on the after-the-fact confirmatory text is simply a red herring. A plain

reading of the confirmatory text message demonstrates that it was nothing more than an estimate

of the average number of weekly texts a subscriber could expect to receive. However, even if

the court accepts Plaintiff's contention that the confirmatory text constitutes additional terms, the

mirror image rule precludes according any legal effect to such terms, it is simply a legal nullity

absent affirmative acquiescence to those new and additional terms by the subscriber. *SCG*

*Harbourwood*, 93 So. 3d at 1200-01 ("holding that a unilateral modification of a contract is

unenforceable" and that "'[a]ny subsequent modification requires consent and a meeting of the

minds of the parties to the contract whose rights or responsibilities are sought to be affected by

the modification.'") (citation omitted); *accord Dows v. Nike*, 846 So. 2d 595, 603 (Fla. 4th DCA

2003).[25]  Plaintiff's proposed class would therefore encompass subscribers who, unlike Plaintiff,

joined the Text Service upon the condition and expectation of receiving up-to-the-minute updates

about the Team, regardless of the frequency of texts sent by BBI, and absent any evidence that

they ever acquiesced to any purported new terms in the confirmatory text. Accordingly, the class

is as unascertainable as those in *Gannon* and *Vigus*, *supra*.

---

[25] An additional issue as to ascertainability, commonality, typicality and predominance, is presented by the fact that at least some subscribers would have joined as a result of entering the "TXT2WIN Sweepstakes" run by Verizon Wireless. Pastore Decl., ¶ 16 (c) & exhibit 3 thereto. Plaintiff offers no way to easily ascertain the identity of such contest subscribers, leaving the Court with no objective means of identifying eligible class members.

## 2.   The Inability to Identify Class Members Renders the Class Unascertainable

To establish ascertainability Plaintiff has the burden to identify the "called party" that received the "violative" texts. 47 U.S.C. § 227(b)(1)(A)(iii).   Plaintiff proposes utilizing each cellular phone number registered with the Text Service to ascertain the "names and/or addresses of the particular persons who were assigned those cell phone numbers at the time of the texts."[26] Plaintiff speculates that such identification would be merely administrative and simply involve: (i) subpoenaing records of the top eight wireless carriers; (ii) utilizing a public records search; or (iii) requiring any recipient of class notice to show in a claim form that he is the user of the cellular phone at the time any allegedly violative text was sent.[27]   However, such speculation makes light of the insurmountable difficulty and complexity involved in such a task.[28]

In *Vigus*, *supra*, the court in denying class certification found that ascertaining who was the called party at the time the offensive calls were made was too difficult, due to the fact that phone numbers could be reassigned, and where reassigned, would require further in-depth analysis to determine who was the assignee at the time the alleged offensive calls were made. Similarly, in *Jamison v. First Credit Services, Inc.*, No. 12 C 4415, 2013 WL 1248306 * 16 (N.D. Ill. March 28, 2013), another TCPA action, the Court rejected using a public records search on the basis that while it might provide information about the current user of a cell phone number, because the proposed class spanned four years (as here) "the current subscribers of the

---

[26] Pl MOL [DE 55], p. 24.

[27] *Id.* at pp. 24-25.  Plaintiff admits that his third "notice and claim form" option is really not an option, acknowledging in footnote 19 of his brief that this method would be employed **after** a subscriber's identity had been obtained through use of one of the two other methods he proposes.

[28] Plaintiff proffers the untimely Declaration of Randall A. Snyder opining as to two methods for identifying subscribers. Aside from BBI's objections to same, as set forth below, Mr. Snyder's Declaration fails to adequately address the widely recognized inherent unreliability and deficiencies in such methods in identifying cellular phone users, especially users going back for a period of four years.

cellphone numbers that were called over that period are likely not to be the same people as who were the subscribers when the calls were made."

The FCC recognizes that there is no publicly available "411" list of cell phone numbers.[29] The FCC also acknowledges that there can be multiple names associated with a given number, which in the context of this action makes identification of the actual called party difficult, if not impossible, without in-depth individual inquiry. *Id.* Moreover, as set forth in the Declaration of BBI's expert, Kenneth Sponsler [attached hereto as **Exhibit C**], not only are the aforesaid difficulties present, but prepaid telephone services and family plan sharing add additional levels of difficulty in determining the historical user identities of cellular phones.[30]

Given the above, the methods advanced by Plaintiff for ascertaining class members are not reliable or administratively feasible.[31] *See Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 286 (D.S.C. 2012) ("'The proposed class definition must not ... require an extensive factual inquiry to determine who is a class member'"). [32]

Finally, Plaintiff's proposed class definition presupposes that each subscriber actually received more than five text messages in any given week. Actual receipt thereof is a further level of individual inquiry that Plaintiff simply chooses to ignore. Because such actual receipt is a fundamental element of any proposed class member's claim, this issue cannot simply be ignored, and renders class action treatment inappropriate. *See Sanneman v. Chrysler Corp.*, 191

---

[29] *See* http://www.fcc.gov/guides/truth-about-wireless-phones-and-national-do-not-call-list.

[30] During his deposition, Plaintiff admitted that his own plan is a family plan. Pl. Trans., 23:17 to 24:14.

[31] Plaintiff cites a number of facsimile cases for the proposition that his proposed class is easily ascertainable. Pl MOL [DE 55] at p. 23. However, such facsimile cases are easily distinguishable from the instant matter in that this case solely involves cellular telephone numbers where it is very difficult to identify the called party and not the use of landlines and facsimile machines where identification issues are not as insurmountable. *See e.g. G.M. Sign Inc. v. Franklin Bank, S.S.B.*, No. 06-C-949, 2008 WL 3889950, *5 (N.D. Ill. Aug. 20, 2008) (limiting class to those who received faxes on their "telephone facsimile machines").

[32] *Cuming v. South Carolina Lottery Com'n*, No. 3:05-cv-03608-MBS, 2008 WL 906705, *1 (D.S.C. March 31, 2008) (If "the practical issue of identifying class members is overly problematic ... administrative burdens of certification may outweigh the efficiencies expected in a class action").

F.RD. 441 446 (E.D. Pa. 2000) (class action treatment is not appropriate where determining class membership would essentially require a mini-hearing on the merits of each class member's case – finding impractical a class of people who purchased vehicles with defective paint).

**B. Plaintiff Has Failed to Meet the Requirements of Rule 23(a)**

Plaintiff has failed to demonstrate that there are questions of law or fact common to the class, that his interest is not adverse to the interests of the proposed class, or that he has met his burden of establishing that all of the requirements of Rule 23(a) have been met.

**1. Plaintiff has Failed to Meet the Commonality and Typicality Requirements of Rule 23(a)**

Typicality generally focuses on whether the claims of the proffered class members arise in different factual contexts than the claims of other class members, and whether the class representatives, in proving their claims, would simultaneously prove the claims of the class members. *See, e.g., Brooks v. Southern Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 57-58 (S.D. Fla. 1990) (denying class certification where representatives' claims found to be atypical because they are "grounded in factual situations differing from those of other class members").

Commonality requires "only that there be 'questions of law or fact common to the class.'" *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). However, this requirement is not met merely because the putative class members "all suffered a violation of the same provision of law." *Wal-Mart Stores*, 131 S. Ct. at 2551. It is not simply a question of whether there are common questions present, but the ability of the class action to "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* As the Supreme Court noted:

> 'What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities

within the proposed class are what have the potential to impede the generation of common answers.' *Id.* (citation omitted).

While the commonality and typicality requirements are discrete requirements, the proof of each tends to merge. *Id.* at 2551, n.5; *accord, Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge").[33]

Here, the scope of each subscriber's consent to receive informational texts concerning the Team is integral to the determination of commonality and typicality. Plaintiff has failed to demonstrate how the factual scenario underpinning his consent to BBI (whether limited or not) - going to the website, reviewing the "3-5" per week language and then subscribing purportedly by cell phone - applies to each proposed member of his putative class, or makes putative class member's claims typical and/or subject to "common answers" as required by the Supreme Court.

### 2. Plaintiff Does Not Satisfy the Adequacy Requirement

Under Rule 23(a)(4) adequacy cannot be presumed, and Plaintiff bears the burden of establishing it. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003). A named plaintiff must demonstrate that he has no interests antagonistic to the interests of the class. *In re. Ins. Mgmt. Solutions Group, Inc.*, 206 F.R.D. 514, 516 (M.D. Fla. 2002). A class cannot be certified where the class representative claims "to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). In other words,

> [u]nless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs. *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974).

---

[33] *See also Griffin v. Dugger*, 823 F.2d 1476, 1489 n.31 (11th Cir. 1987); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996).

In *Phillips*, the district court denied certification where the plaintiffs sought to certify a class on behalf of 1,500 former postal workers where it was alleged that they had been coerced into premature retirement. In denying certification, the court noted that among the proposed class members it was likely that the offer of early retirement was viewed quite differently from the plaintiffs. *Id.* at 366-67. This difference among class members was sufficient to deny certification. As noted by the court:

> In view of the likelihood that there will be divergent views among the employees who pursued the voluntary retirement route, as to whether they have been injured or benefited we cannot say the District Court erred in concluding that plaintiffs cannot fairly maintain the action they have brought in behalf of the more than 1,500 former employees). *Id.*

Here, Plaintiff is seeking redress against BBI for allegedly sending more news and information about the Team than he and other class members ever wanted or agreed to receive. Plaintiff has no knowledge about what other class members understood or wanted to receive in terms of the frequency of the number of text messages sent to them as part of the Text Service.[34] Plaintiff must instead advance the dubious supposition that despite all the promotions of the Text Service promising "up-to-the-minute" news about the Team, including the promotion Plaintiff viewed on BBI's website, the limiting language he seeks to impose on each class member means that regardless of the actual number of breaking news events about the Team in a given week, all putative class members, including him, only want the first five and no more.[35]

Such a position leads to absurd results.[36] BBI has no control over news events such as injuries, in game developments, etc... – the types of information fans of the Team typically wish

---

[34] Pl. Trans., 56:20 to 57:3; 59:18 to 72:14; 74:25 to 75:8; 79:20 to 80:15.

[35] *Id.* at 56:4-19.

[36] Plaintiff testified that despite signing up for "up-to-the-minute" news and alerts, if a significant player acquisition or other momentous news occurred, he did not want a text if it would exceed his weekly five texts. Plaintiff had difficulty reconciling these two opposing objectives he had in joining the Text Service, suggesting instead that BBI exercise prescience when it comes to breaking news, and plan accordingly. *Id.* at 53:1 to 57:3.

to receive.[37]  Other than the Complaint in this action, BBI has not received a single other

complaint from subscribers to the Text Service about the number of texts being excessive.[38]  In

fact, the opposite is the case; when news is not "up-to-the-minute," there are observed

complaints on BBI's blog at its website.[39]

Logic and common sense dictate that, most, if not all, subscribers were receiving the very

information they had expressly signaled an interest in receiving.  Plaintiff's interest in bringing

this suit and trying to obtain a possibly devastating monetary award in the hundreds of millions,

if not billions, of dollars and to curtail the number of texts sent by BBI, is therefore antagonistic

to the interests of at least some (most likely the vast majority) of subscribers in his proposed

class.[40]  Plaintiff has therefore failed to meet the adequacy requirement of Rule 23(a)(4).[41]

### C.      Plaintiff Has Failed to Meet the Predominance Requirement of Rule 23(b)(3)

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation." *Amchen*, 521 U.S. at 623-24.  Where there are a greater

number of questions peculiar to individuals within the class, and uncommon questions are

"significant," the predominance requirements cannot be met.  *Id.* at 624.

Courts that have considered TCPA class actions have denied certification based upon the

predominance of individual issues related to consent.  *See Balthazor v. Cent. Credit Serv., Inc.*,

No. 10-62435-CIV, 2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) (denying Plaintiff's class

---

[37] Pastore Decl., ¶ 19.

[38] *Id.* at ¶ 20.

[39] *Id.* at ¶ 21.

[40] Pl MOL [DE 55] at pp. 2 (fn. 2) & 5 asserts there are 47 alleged willful violations of the TCPA; that the putative class size could be as high as 43,203; and that he is seeking treble damages under the TCPA of $1,500 per alleged willful violation on behalf of the class.  (47 x 43,203 x 1,500 = $3,045,811,500). An amount significantly more than what Plaintiff asserts is the net worth of the Team ($805 million)!

[41] In determining this motion, the Court should also consider the context within which the Text Service is being offered.  As noted in *Ryabyshchuck v. Citibank (South Dakota) N.A.*, No. 11–CV–1236–IEG (WVG), 2012 WL 5379143, * 2 (S.D. Cal. Oct. 30, 2012), courts must utilize common sense in determining potential violations of the TCPA, and place the alleged offending calls within context.

certification motion where it found that establishing the issue of consent would require an

individual assessment/inquiry of each class member and unwarranted mini-trials); *accord Hicks*

*v. Client Servs., Inc.*, No. 07–61822–CIV, 2008 WL 5479111 (S.D. Fla. Dec. 11, 2008).[42]  For

the reasons set forth above with respect to the issues of individualized consent, such individual

issues predominate, requiring a host of mini-trials on the issue of consent.  For these reasons,

Plaintiff has failed to meet his burden under Rule 23(b)(3).

The Eleventh Circuit has noted that "claims for breach of contract are peculiarly driven

by the terms of the parties' agreement, and common questions rarely will predominate if the

relevant terms vary in substance among the contracts."  *Sacred Heart Health Sys., Inc. v.*

*Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) (reversing order

granting certification of purported class of 260 hospitals located in six states) (citation

omitted).[43]  When (as here) the underlying claim for liability rests upon an assertion of breach of

contract, the plaintiff in seeking certification must "'provide an extensive analysis of state law

variations to reveal whether these pose insuperable obstacles.'"  *Id.* at 1180 (citation omitted).

Plaintiff has failed in this regard.

Given the underlying contract issues present in this case, and that the putative class is in

excess of 20,000 subscribers, it is likely, and Plaintiff has failed to adduce evidence otherwise,

that individual state contract law questions on the issue of consent would predominate, thereby

precluding certification in this instance.  *See Coca-Cola Bottling Co. of Elizabethtown, Inc. v.*

---

[42] *See also, Gannon, supra*; *Vigus, supra*; *Gene and Gene, LLC v. Biopay, LLC*, 541 F.3d 318 (5th Cir. 2008); *Sadowski v. Med1Online, LLC*, No. 07C 2973, 2008 WL 489360 (N.D. Ill.  Feb. 20, 2008); *Cicero v. U.S. Four, Inc.*, No. 07AP-310, 2007 WL 4305720 (Ohio Ct. App. 10th Dist. 2007).
[43] While Plaintiff contends that the potential class members are all subject to the same contract, and undoubtedly asserts that class treatment is appropriate, as demonstrated above, the contracts between subscribers and BBI are individualized and heavily dependent upon the personal scope of the consent being given.  This case is therefore not the type of form contract case that lends itself to class treatment.  *Sacred Heart* at 1171 ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").

*Coca-Cola Co.*, 95 F.R.D. 168, 178 (D. Del. 1982) (denying class certification where despite contracts of putative class members being identical in material terms, interpretation of those contracts would require analysis of 32 different state's contract law).

Finally, the contract interpretation advanced by Plaintiff creates individualized issues under Rule 23(b)(3) warranting denial of his certification motion. It is axiomatic that "[i]n construing a contract, the intention of the parties is ascertained from the language used in the instrument **and the object to be accomplished** …." *Nawaz v. Universal Prop. & Cas. Ins. Co.*, 91 So. 3d 187, 188 (Fla. 4th DCA 2012) (emphasis added). Thus, "'the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose.'" *Murley v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009). The intention of the parties to a contract must "be ascertained from a consideration of the entire agreement." *State of Fla. for Use and Benefit of Westinghouse Elec. Supply Co. v. Wesley Const. Co.*, 316 F. Supp. 490, 495 (S.D. Fla. 1970).

The clear meaning and purpose of the solicitation to which Plaintiff allegedly responded was to provide subscribers with "up to the minute news and team alerts", under circumstances where – admittedly – news/alerts about the Team would increase or decrease in frequency depending on the time of year. Within this context, the receipt of "3 to 5" or "up to 5" alerts cannot be interpreted as a fixed minimum and maximum; rather, at most, it is nothing more than an estimated average.[44] Plaintiff's interpretation of the "contract" defeats the intended purpose of the Text Service. However, even if the Court were to give some credence to Plaintiff's interpretation, the equally plausible interpretation advanced by BBI creates an ambiguity and

---

[44] When averaged over the past four years of the Text Service the average weekly number of texts messages has been less than three. Pastore Decl., ¶ 22.

therefore an issue of fact. *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1439 (11th

Cir. 1996).  Such a factual inquiry also runs the risk of devolving into a quagmire of mini-trials.

### D.      A Class Action is not the Superior Method of Adjudication

Rule 23(b)(3)(d) provides that the Court must consider, *inter alia*, "the likely difficulties

in managing the class." As discussed, infra, the individual inquiries necessary to arrive at a

decision on the issue of liability renders this action unmanageable as a class action. *Vigus*, 274

F.R.D. at 237.  Moreover, as noted above, none of the methods proposed by Plaintiff can

adequately provide notice to the putative class.  The methods suggested by Plaintiff are

cumbersome and unreliable.

Plaintiff further asserts that class actions "are particularly important where multiple

lawsuits would not be justified because of the small amount of money sought by the individual

plaintiff."[45]  Here, Plaintiff has purportedly identified 47 alleged violations, which for a class

member who had been a subscriber that entire time would amount to $23,500 for non-willful

violations and $70,500 for willful violations.  Even the $1,500 to $4,500 in damages purportedly

suffered by Plaintiff individually is not a negligible amount.

In enacting the TCPA, it was noted by Senator Fritz Hollings, that:

> "The ... [Act] contains a private right-of-action provision that will make it easier
> for consumers to recover damages from receiving these computerized calls. The
> provision would allow consumers to bring an action in State court against any
> entity that violates the bill ... Small claims court or a similar court would allow the
> consumer to appear before the court without an attorney. 137 Cong. Rec. 30821–
> 30822 (1991).

*See also Gannon*, 2013 WL 2450199 at *4; *Vigus*, 274 F.R.D. at 235 (noting that putative class

members in TCPA actions would have a superior remedy in more speedy venues such as, for

example, a small claims court).  Here, Plaintiff seeks up to $1,500 in damages for each of the 47

---

[45] Pl. MOL [DE 55], p. 20.

alleged violations he purportedly identified. As such, the potential damages available to each putative class member are limited only by the number of texts sent to each subscriber, which as noted above, could be a significant amount of money. Plaintiff's contention that class action certification is appropriate due to the "small amount of money sought by the individual plaintiff" is unjustified and without basis. Plaintiff has therefore failed to establish that superiority exists under Rule 23(b)(3).

## III.   CONCLUSION

"Like any statutes … remedial laws can themselves be abused and perverted into money-making vehicles for individuals and lawyers." *Saunders*, 910 F. Supp. 2d at 465. This is one of those cases. For the reasons set forth above, Plaintiff's motion should be denied.

Dated: July 12, 2013
      Buffalo, New York

Respectfully submitted,

/s/ Jeffrey F. Reina
Jeffrey F. Reina, Esq.
(Lead counsel)
N.Y. Bar No. 3011822 (Pro Hac Vice)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
jreina@lglaw.com
Telephone: (716) 849-1333 [Ext. 481]
Facsimile: (716)849-1315

Janelle A. Weber, Esq.
Florida Bar No. 017630
SHUTTS & BOWEN LLP
4301 W. Boy Scout Boulevard, Suite 300
Tampa, Florida 33607
jweber@shutts.com
Telephone: (813) 227-8152
Facsimile: (813) 229-8901
*Attorneys for Defendant Buffalo Bills, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of July, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

James Salvatore Giardina, Esq.
james@consumerrightslawgroup.com

Scott D. Owens, Esq.
scott@scottdowens.com

Keith J Keogh, Esq.
keith@keoghlaw.com

/s/ Jeffrey F. Reina___
Attorney