UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

---

JERRY WOJCIK, an individual, on behalf of
himself and all others similarly situated,

      Plaintiff,

v.

BUFFALO BILLS, INC.,
A New York Corporation,

      Defendant.

Case No. 8:12-cv-02414-SDM-TBM

---

### DEFENDANT BUFFALO BILLS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, BUFFALO BILLS, INC., a New York corporation ("BBI"), hereby submits its Memorandum in Support of its Motion for Summary Judgment seeking entry of judgment in its favor on the Complaint of Plaintiff Jerry Wojcik ("Wojcik")

### I. INTRODUCTION

#### A. Summary of Argument

Plaintiff Jerry Wojcik ("Wojcik") is a subscriber to the text alert service operated by Defendant BBI (the "Text Service").[1] Wojcik alleges in this putative class action that BBI violated the terms and conditions of the Text Service by sending him text messages in excess of five per calendar week.[2] Wojcik contends that he never gave consent to receive more than five text messages per calendar week, and that any text sent in excess

---

[1] As set forth at paragraph 5 to the accompanying Declaration of Gregg Pastore dated October 29, 2013 (the "Pastore Decl."), the Text Service was discontinued by BBI on October 10, 2013. [**Exhibit A**, hereto].

[2] Plaintiff's Complaint [DE 1].

of five per calendar week is a violation of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 (the "TCPA").[3]

It is undisputed that all subscribers to BBI's Text Service, including Plaintiff, voluntarily provided their cell phone numbers to BBI for the purpose of receiving informational texts about its NFL team the "Buffalo Bills" (the "Team"). As such, this case does not involve unsolicited text message spam. At no time did BBI contact uninterested individuals as to its Text Service, whether through use of a purchased list of cellular phone numbers or random calling. This is a case where the relationship between BBI and each subscriber was prompted by the subscriber. Each subscriber, including Plaintiff, had the ability to voluntarily opt out at any time (something Plaintiff - who remained a subscriber up until the Text Service was discontinued by BBI - never elected to do) by texting a four-letter word, "STOP."

As set forth below, under both the TCPA and traditional principles of contract law, Plaintiff cannot claim that he either did not give BBI consent to send him in excess of 5 text messages per week, or that his consent was somehow limited to receiving no more than 5 text messages per week. The issues presented on this motion are purely ones of legal interpretation, which under established law require a finding in favor of BBI, and an award of summary judgment.[4]

---

[3] *Id.*

[4] The instant motion is being filed in accordance with this Court's scheduling order, and addresses legal and factual arguments appropriate for summary judgment; legal arguments in favor of dismissal of Plaintiff's Complaint were also briefed at length in Defendant BBI's still pending Motion to Dismiss [DE 5] filed on November 19, 2012.

B.  **Statement of Undisputed Material Facts**

Subscribers joined the Text Service by voluntarily providing their cellular telephone number to BBI; thereafter they received a confirmatory text message, and they remained active subscribers until texting the word "STOP".[5] BBI advertised and promoted its Text Service through a variety of different means, including emails, written advertisements, in-game banner ads at Ralph Wilson Stadium (the Team's home field), social media (i.e. Facebook and Twitter), promotions at training camp, and on its Internet website.[6] The solicitations took many forms, but only the website contained the "3-5" language Plaintiff allegedly relied upon in joining the Text Service.[7]

Plaintiff is a knowledgeable follower of NFL football and a professed fan of the Team.[8] He subscribed to the Text Service on September 12, 2012,[9] in order to get information about the Team "quicker" because such information was important to him "as a fan."[10] Plaintiff is aware of and acknowledges that there are peak periods of news concerning NFL teams such as the college draft, regular season, playoffs, and Super Bowl.[11] Conversely, Plaintiff admits that when NFL teams are not in season there is less news concerning teams, including the Buffalo Bills.[12]

Plaintiff contends that upon visiting the Team's website, he viewed a solicitation for the Text Service, which, in relevant part, stated:

---

[5] Pastore Decl., ¶¶ 10-14.
[6] Id. at ¶ 16, Exhibits 1, 2, 3, 4, 5 and 6 thereto.
[7] Id.
[8] Deposition Transcript of Plaintiff Wojcik ("Pl Trans.") at 16:22 to 22:1 [**Exhibit B**, hereto].
[9] Complaint [DE 1] at ¶ 16.
[10] Pl. Trans., 30:10 to 31:9.
[11] Id. at 28:2 to 29:6; and 29:12-14.
[12] Id. at 29:6-14.

3

> Get up to the minute news and team alerts sent directly to your phone! ...
> To opt in text BILLS to 64621 Verizon Wireless Text Alerts ...
> You will be opted in to receive 3-5 messages per week for a period of 12 months.
> Text **STOP** to cancel. Text **HELP** for help."[13]

While acknowledging that the phrase "no more" is not used in this solicitation, Plaintiff nevertheless contends that this was a promise of no more than five texts per week, and that this was all he reviewed prior to joining the Text Service.[14]

## II. ARGUMENT

Pursuant to Federal Rule of Civil Procedure 56(c), a district court's decision to grant summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry when determining whether to grant a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

The moving party bears the initial burden of demonstrating to the court that the record does not contain any genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Whether a fact is material or not is a question that requires the moving party to defer to substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the

---

[13] Complaint [DE 1], ¶ 17.
[14] Pl. Trans., 38:11 to 40:5; 40:14-25; and 100:9-23.

4

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (internal citation and quotations omitted). In addition, the dispute must have a "real basis in the record" in order to constitute a genuine dispute of fact. *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (citation omitted)). Thus, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005).

Based upon the undisputed facts before the Court, there is no material issue of fact that would preclude judgment in favor of Defendant BBI, and Plaintiff Wojcik's Complaint should be dismissed in its entirety.

> A. **The Prior Express Consent Element Under The TCPA Was Satisfied When Plaintiff Voluntarily Supplied His Telephone Number**

Put simply, Plaintiff's two claims for relief, which are entirely predicated upon alleged violation of the TCPA, are not actionable under that statute given the undisputed facts before the Court. Section 227(b)(1)(A) of the TCPA prohibits any person from making:

> Any call (**other than** a call made for emergency purposes or **made with the express prior consent** of the called party) using an automatic telephone dialing system ...
>
> (iii) to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call. (Emphasis added).

5

Section 227(a)(1) defines an "automatic telephone dialing system" ("ATDS") as "equipment which has the capacity ... (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Thus, to make out such a claim, a plaintiff must allege an absence of prior express consent to receive text messages, and that the text messages were sent from an ATDS.

The House report on what became section 227 states the "[t]he restrictions on calls to emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications." 23 F.C.C.R. 559, 564 (*quoting* 23 H.R. REP. No. 102-317 at 17 (1991)).

Similarly, the Federal Communications Commission ("FCC") has stated "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instruction to the contrary." 7 F.C.C.R. 8752, 8769 (1992). Also, "[w]e emphasize that prior express consent is deemed to be granted ... if the wireless number was provided by the consumer ...." 23 F.C.C.R. 559, 564 (2008).

The <u>voluntary and affirmative</u> act of each subscriber in providing a cellular phone number to BBI prior to any text message being sent satisfies the prior express consent requirement of the TCPA. *See generally, Saunders v. NCO Fin. Sys., Inc.*, 910 F.Supp.2d 464, 467 (E.D.N.Y. 2012) (citing numerous cases and recognizing that "authorities are almost unanimous that voluntarily furnishing a cellular number to a vendor or other contractual counterparty constitutes express consent") (citations omitted); *Emanuel v. Los Angeles Lakers, Inc.*, No. CV 12–9936–GW(SHx), 2013 WL 1719035 *3 (C.D. Cal.

April 18, 2013) (granting defendant's motion to dismiss the plaintiff's putative class action complaint brought under the TCPA, and holding that the voluntary act of supplying one's cellular telephone number negates any claim under the TCPA, stating that "'[t]o hold otherwise would contradict the overwhelming weight of social practice: that is, distributing one's telephone number is an invitation to be called[.]'"); *Ibey v. Taco Bell Corp.*, No. 12–CV–0583–H (WVG), 2012 WL 2401972, 3 (S.D. Cal. June 18,2012) ("Plaintiff expressly consented to contact by Defendant when he initially texted 91318 to Defendant").

In *Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-02902-CLS, 2012 WL 5511039, * 2 (N.D. Ala. Nov. 9, 2012), Wal–Mart employees asked the plaintiff for several pieces of personal information, including her cellular telephone number. The plaintiff provided that information. The employees noted that plaintiff's telephone number was needed "'in case there were any questions that came up.'" None of Wal-Mart's employees explicitly sought permission to send plaintiff text messages. In granting Wal-Mart's motion to dismiss, the *Pinkard* court referred to the above cited 1992 FCC Ruling, and held that "'[p]rior express consent' to receive a call is given when the 'called party' voluntarily proffers her telephone number to the calling party. By her complaint's own admission, plaintiff provided her telephone number to defendant at defendant's request." *Id.* at *6.

In *Roberts v. PayPal, Inc.*, No. C 12–0622 PJH, 2013 WL 2384242, *1-2 (N.D.Cal. May 30, 2013), the plaintiff accessed his PayPal account via PayPal's website and provided his telephone number. Immediately thereafter, the plaintiff received a text message promoting PayPal's mobile services.

7

In moving for summary judgment, PayPal advanced two arguments: (1) the plaintiff consented to receive text messages when he provided his cell phone number to PayPal via its website; and alternatively, (2) the plaintiff consented to receive text messages by accepting the PayPal user agreement, which had been recently updated, but allegedly not seen by the plaintiff, and which allowed for PayPal to contact its customers by phone. *Id.* at *3. In granting PayPal's motion for summary judgment, the court noted that the essence of PayPal's first argument was that "plaintiff consented to receive text messages <u>simply by providing his cell phone number to PayPal</u>". *Id.* at *3 (emphasis added). The *Roberts* court then granted PayPal summary judgment on this argument, and because consent had been given, declined to address Paypal's second argument. *Id.* at *4-5.

As highlighted in *Pinkard*, *Roberts* and the other cases cited above, the mere act of providing one's cellular telephone number satisfies the prior express consent element under the TCPA. It is undisputed that Plaintiff Wojcik voluntarily supplied his telephone number to Defendant BBI. This act obviates any purported claim under the TCPA.[15]

Moreover, it is proper under the TCPA for the Court to consider the context within which the allegedly offending texts were sent. *See Ryabyshchuck v. Citibank (South Dakota) N.A.*, No. 11–CV–1236–IEG (WVG), 2012 WL 5379143, * 2 (S.D. Cal. Oct. 30, 2012) (noting that courts must utilize common sense in determining potential violations of the TCPA, and place the alleged offending calls within context); *Roberts*, 2013 WL

---

[15] The *Pinkard* court further held that the burden of limiting one's consent under the TCPA falls upon the party providing his cellular telephone number. *Pinkard* at *7 (because "plaintiff voluntarily "provided the defendant with her phone number (i.e. generally consents), it was her responsibility to explicitly state the limited scope of her consent." Here, it is likewise undisputed that Plaintiff did not expressly limit his consent in any manner when he voluntarily provided his number to BBI in order to subscribe to the Text Service.

2384242 at *4 ("the content of the complained-about text message is closely related to the circumstances under which plaintiff provided his cell phone number"). Logic and common sense dictate that within the context of providing informational text messages to Plaintiff about the Team, Plaintiff was receiving the very information he had expressly signaled an interest in receiving, and not the unsolicited "robo" solicitations the TCPA was enacted to prevent.

As noted by the FCC:

> While we observe the increasing pervasiveness of telemarketing, we also acknowledge that wireless services offer access to information that consumers find highly desirable and thus do not want to discourage purely informational messages. As was roundly noted in the comments, wireless use has expanded tremendously since passage of the TCPA in 1991. We believe that requiring prior express written consent for all robocalls to wireless numbers would serve as a disincentive to the provision of services on which consumers have come to rely.

27 F.C.C.R. 1830, 1841.

To allow Plaintiff to improperly expand the scope of the TCPA to apply to the facts in this case would, in all likelihood, lead to the disincentive and discouragement of informational text services against which the FCC has cautioned. In this instance, the fact that more text messages were purportedly sent than were originally offered does not alter the analysis. The "prior express consent" requirement was satisfied the moment Wojcik texted the word "BILLS" to short code 64621, thereby voluntarily and affirmatively assenting to participation in the Text Service. As cautioned in *Ryabyschuck*:

> These circumstances 'unmistakably' display some measure of prior consent ... and dispel any allusion to 'the proliferation of intrusive, nuisance calls' targeted by the TCPA. *See Mims,* —— U.S. ——, 132 S.Ct. at 744, 181 L.Ed.2d 881 ... A finding to the contrary

> would 'stretch an inflexible interpretation beyond the realm of reason.'

*Ryabyshchuck*, 2012 WL 5379143 at *3 (internal citations omitted). Should the Court rule otherwise, it would expand the scope of the TCPA beyond congressional intent and authorization, and encompass situations never meant for redress under the statute.

### B. The Confirmatory Text Message Sent <u>After</u> Plaintiff had <u>Already</u> Joined the Text Service Does Not Alter the General Nature of the Consent He Had <u>Already</u> Given

In his class certification motion, Plaintiff recognized the problem he faced in relying solely upon his voluntary provision of his cellular phone number in response to the general solicitation on BBI's website to establish his TCPA claim. Plaintiff therefore advanced a second contention that the confirmatory text message sent after a subscriber joined imposes a limit on the consent for all subscribers.[16] However, such a contention is without merit, and does not preclude awarding BBI summary judgment.

Plaintiff's counsel asserted in open court that the underlying agreement between BBI and each of its subscribers sounds in contract law.[17] Under the law of Florida, the forum state, the confirmatory text message sent to Plaintiff after he joined the Text Service is of no legal import, and is not enforceable.[18] A contract is made "when three elements are present: offer, acceptance, and consideration." *SCG Harbourwood, LLC v.*

---

[16] Plaintiff's Memorandum of Law in Support of Class Certification ("Pl Cert MOL") [DE 55].

[17] *See* Exhibit 4 to Pl Cert MOL [DE 55], p 21; l 20-22.

[18] Under Florida law, the choice of law governing the validity and substantive obligations of a contract are determined by the law of the place where the contract was made. *Jemco, Inc. v. United Parcel Service, Inc.*, 400 So.2d 499, 501 (3d DCA 1981). A "contract is made at the place where the last act necessary to complete the contract is done." *Id.* at 500-01. For purposes of this motion, BBI assumes that in analyzing Plaintiff's individual claim under the TCPA, the "contract" was made while he was at home reviewing BBI's website and subscribing to the service. Plaintiff's contract with BBI was therefore made in Florida, and Florida law would apply to interpreting this agreement.

*Hanyan*, 93 So. 3d 1197 (Fla. 2d DCA 2012). In addition, "Florida employs the 'mirror image rule' with respect to contracts. Under this rule, in order for a contract to be formed, an acceptance of an offer must be absolute, unconditional and identical with the terms of the offer." *Montgomery v. English*, 902 So. 2d 836, 837 (Fla. 5th DCA 2005).

Even if the Court were to accept Plaintiff's contention that the confirmatory text constitutes additional offered terms, the mirror image rule precludes according any legal effect to such terms. The confirmatory text, and any purported terms set forth therein, is simply a legal nullity absent affirmative acquiescence to the purported new and additional terms by the subscriber. *SCG Harbourwood*, 93 So. 3d at 1200-01 (holding that a purported unilateral modification of a contract is unenforceable and that "'[a]ny subsequent modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification.'") (citation omitted); *accord Dows v. Nike*, 846 So. 2d 595, 603 (Fla. 4th DCA 2003).

Here, Plaintiff has not provided evidence that he ever acquiesced to any alleged additional terms from BBI. In fact, during his deposition, Plaintiff simply stated that the confirmatory text message only confirmed what he thought the scope of his consent was after viewing and responding to BBI's solicitation on its website.[19] As will be dealt with in more detail below, under basic contract interpretation rules, BBI's website solicitation cannot be read to impose any limit on the number of text messages. Therefore, Plaintiff's admission that the confirmatory text did nothing more than confirm for him what he believed (however unreasonably) to be the scope of his consent in initially joining the

---

[19] Pl. Trans., 80:16 to 81:12.

11

Text Service undercuts any contention that the confirmatory text has any independent legal impact.

### C. Under Traditional Principles of Contract Law, BBI's Text Service Was Not Limited in the Number of Text Messages That Could be Sent

Here, BBI made a myriad of offers to subscribers to the Text Service. As evidenced by Exhibits 1 to 6 to the Pastore Decl., Plaintiff has previously taken the position that none of those advertisements contained any terms and conditions. However, even a cursory examination evidences that they did. What such advertisements offered, including the one viewed by Plaintiff on BBI's website, was the right to receive "up-to-the-minute" news and alerts about the Team.

As noted repeatedly by BBI in its filings in this matter, even a casual follower of NFL football knows - let alone a professed fan such as Plaintiff - that there are anticipated periods of peak activity concerning individual teams.[20] Free agency in March/April; the NFL entry draft in April; mini-camp in early summer; training camp in mid-to-late summer; the regular season; and (hopefully) the playoffs and Super Bowl, are all examples of peak NFL periods of interest and activity. Not only would fans of the Team be aware of such peak periods, but logically they would be looking forward to receiving as much Team information as possible during those periods.[21] Subscribers to the Text Service usually sign up because they want all of the information about Team

---

[20] Pl. Trans., 28:2 to 29:14.
[21] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* 27 F.C.C.R. 15391 (2012) ("SoundBite"), the FCC issued an immediately effective Ruling stating that that "the restriction on calls to emergency lines, pagers, and [wireless numbers] does not apply where the called party has provided the telephone number of such a line to the caller for use in normal business communications," i.e. communications that are "expected or desired between businesses and their customers." SoundBite, at ¶ 8. This ruling again calls into question whether the TCPA even applies where, as here, the recipient of the text messages has invited the sending of such text messages.

12

happenings as fast as they can receive it.[22] If fans did not want such "up-to-the-minute" reports on Team activities, they would likely refrain from joining the Text Service, and instead read the newspaper or catch a news report. The Text Service is nothing more than an "up-to-the-minute" informational service provided to fans of the Team who have an expressed interest in receiving this information.

In interpreting the agreement between Plaintiff and BBI with respect to the number of texts messages to be sent, the Court should be mindful of the admonition that "[i]n construing a contract, the intention of the parties is ascertained from the language used in the instrument **and the object to be accomplished** ...." *Nawaz v. Universal Prop. & Cas. Ins. Co.*, 91 So. 3d 187, 188 (Fla. 4th DCA 2012) (emphasis added). Thus, "courts are to be mindful that 'the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose.'" *Murley v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009) (emphasis added). The intention of the parties to a contract must "be ascertained from a consideration of the entire agreement." *State of Fla. for Use and Benefit of Westinghouse Elec. Supply Co. v. Wesley Const. Co.*, 316 F. Supp. 490, 495 (S.D. Fla. 1970).

Similar to placing the text messages in context for purposes of analyzing liability under the TCPA, under principles of contract law, the clear meaning and purpose of the solicitation to which Plaintiff allegedly responded was to provide subscribers with "up to the minute news and team alerts." Within this context, the receipt of "3 to 5" alerts per week over a period of twelve months cannot be interpreted as a fixed minimum and maximum; rather, at most what is being promoted is nothing more than an estimated

---

[22] Pastore Decl., ¶ 18.

average, which as noted in the Pastore Decl. has been less than three texts per week on average.[23]

Plaintiff's interpretation of the "contract" therefore defeats the intended purpose of the Text Service, and leads to absurd results.[24] BBI had no control over news events such as injuries, in game developments, etc...– the types of information fans of the Team typically wish to receive.[25] Other than the Complaint in this action, BBI had not received a single complaint from other subscribers to the Text Service about the number of texts being excessive.[26] In fact, the opposite is the case; when news was not "up-to-the-minute," there were observed complaints on BBI's blog at its website.[27]

Plaintiff's interpretation of the "contract" between him and BBI focuses solely upon the "3 to 5" language at the expense of rendering the other terms including, the promise to receive up-to-the-minute news about the Team meaningless. The Court must avoid interpretation of an agreement that would render one term superfluous or meaningless at the expense of another. *Universal Prop. and Cas. Ins. Co. v. Johnson*, 114 So.3d 1031, 1036 (Fla. 1st DCA 2013) ("A contract is not to be read so as to make one section superfluous, and so '[a]ll the various provisions of a contract must be so construed ... as to give effect to each.'") (citation omitted). Placed in context, the "3 to 5" language that Plaintiff purportedly observed on BBI's website must therefore be read in

---

[23] Pastore Decl., ¶ 22.
[24] Plaintiff testified that despite signing up for "up-to-the-minute" news and alerts, if a significant player acquisition or other momentous news occurred, he did not want a text if it would exceed his weekly five texts. Plaintiff had difficulty reconciling these two opposing objectives he had in joining the Text Service, suggesting instead that BBI exercise prescience when it comes to breaking news, and plan accordingly. *Id*. at 53:1 to 57:3.
[25] Pastore Decl., ¶ 19.
[26] *Id*. at ¶ 20.
[27] *Id*. at ¶ 21.

conjunction with the language promising a subscriber that he would "Get up to the minute news and team alerts sent directly to your phone!" The only reasonable interpretation of the entire solicitation on BBI's website is to interpret it to mean that the "3 to 5" language was merely stating an average, and not imposing an absolute maximum limit on the number of text messages that were to be sent. *Id.* ("a contract will not be interpreted in such a way as to render a provision meaningless when there is a reasonable interpretation that does not do so").

Application of general rules of contract construction therefore preclude any interpretation by Plaintiff that the solicitation on BBI's website set an absolute maximum to the number of texts messages he was to receive. Accordingly, since there was no absolute limit (only an estimated average), there was no limit to exceed, and therefore no violation of the TCPA.[28] Accordingly, Plaintiff has no legally cognizable claim under the TCPA, and the motion for summary judgment of Defendant BBI should be granted.

### D. It is Undisputed That an ATDS Was Not Utilized to Send Text Messages

Section 227(a)(1) of the TCPA, defines an ATDS as "equipment which has the capacity ... (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The mere storing of voluntarily submitted cellular telephone numbers, and the sending out of text messages to those numbers is insufficient to establish the use of an ATDS. *See generally Buslepp v. Improv Miami, Inc.*, No. 12–60171–CIV, 2012 WL 4932692, *2 (S.D. Fla. Oct. 16, 2012) ("Defendant's storing customers' phone numbers in a database ... does not establish that

---

[28] As noted above in Fn. 23, historically the average number of texts sent out by BBI was less than 3 text messages per week on average.

Defendant used an ATDS"). Moreover, even if the software utilized by Vibes could be altered to give it the capacity to store or produce and call numbers from a random or sequential number generator, the undisputed fact is that at the time BBI ran the Text Service it did not have the present capacity to do so, and therefore does not qualify as an ATDS. *See generally*, *Hunt v. 21st Mortg. Corp.* No. 2:12–CV–2697–WMA, 2013 WL 5230061, *4 (N.D. Ala., September 17, 2013) ("to meet the TCPA definition of an 'automatic telephone dialing system,' a system must have a present capacity, at the time the calls were being made, to store or produce and call numbers from a number generator).

The accompanying Declaration of John Haro [**Exhibit C**, hereto], establishes that the equipment utilized to send out the text messages was not an ATDS. Such equipment was not used for, nor did it have the capability to store or produce numbers to be called using a random or sequential number generator. Accordingly, there is no proof that an ATDS was used, and Defendant BBI's motion for summary judgment should be granted. *Wood v. GC Services, LP*, 8:10–cv–1979–T–27TBM, 2012 WL 987761, *8-10 (M.D. Fla., January 26, 2012) (report and recommendation, which recommended entry of summary judgment in favor of defendant on the basis that plaintiff failed to prove the use of an ATDS), *aff'd on that ground*, *Wood v. GC Services, LP*, No. 8:10-CV-1979-T-27TBM, 2012 WL 995207 (M.D. Fla. Mar 23, 2012).

III. CONCLUSION

Based upon the foregoing, the motion for summary judgment of Defendant BBI should be granted, and this Court should enter judgment in favor of BBI on the Complaint of Plaintiff.

Dated: October 29, 2013
Buffalo, New York


Respectfully submitted,

| | |
|---|---|
| /s/ *Jeffrey F. Reina* | /s/ *Janelle A. Weber* |
| Jeffrey F. Reina, Esq. | Janelle A. Weber, Esq. |
| (Lead counsel) | Florida Bar No. 017630 |
| N.Y. Bar No. 3011822 (Pro Hac Vice) | SHUTTS & BOWEN LLP |
| LIPSITZ GREEN SCIME CAMBRIA LLP | 4301 W. Boy Scout Boulevard, Suite 300 |
| 42 Delaware Avenue, Suite 120 | Tampa, Florida 33607 |
| Buffalo, New York 14202 | jweber@shutts.com |
| jreina@lglaw.com | Telephone: (813) 227-8152 |
| Telephone: (716) 849-1333 [Ext. 481] | Facsimile: (813) 229-8901 |
| Facsimile: (716)849-1315 | *Attorneys for Defendant Buffalo Bills, Inc.* |

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on this 29th day of October, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    James Salvatore Giardina, Esq.
    james@consumerrightslawgroup.com

    Scott D. Owens, Esq.
    scott@scottdowens.com

    Keith J Keogh, Esq.
    keith@keoghlaw.com


          /s/ Jeffrey F. Reina___
          Attorney